STATE OF NEBRASKA, APPELLEE, V.
RODNEY M. FREAR, APPELLANT.
561 N.W.2d 591

Filed March 18, 1997.    No. A-96-390.

Thomas J. Gaul, Deputy Hall County Public Defender, for appellant.

Don Stenberg, Attorney General, and David T. Bydalek for appellee.

MILLER-LERMAN, Chief Judge, and IRWIN and SIEVERS, Judges.

SIEVERS, Judge.

After a jury trial, Rodney M. Frear was found guilty of third degree assault on a police officer, in violation of Neb. Rev. Stat. § 28-931 (Reissue 1995). Frear now appeals to this court, arguing that the district court erred in denying his motion to serve as cocounsel and in denying his proposed jury instructions concerning self-defense and concerning the use of force by a police officer when making an arrest. For the reasons set forth below, we affirm.

## BACKGROUND

This case arises out of a series of events which occurred on June 26, 1995. Two police officers from the Grand Island Police Department, Officer Jim Titsworth and Sgt. Danny Dubbs, were called to the 2200 block of North Houston concerning a loud music complaint. Upon arriving, Titsworth and Dubbs determined that the music was coming from Frear's house, and both observed that Frear's front door was open but that the all-glass storm door was closed. Titsworth testified that no one answered the door after he knocked, so he shined his flashlight into the house in an effort to attract someone's attention. At that time, he noticed several beer bottles both on a coffee table and on the floor. An adult male then got up and came to the door.

The witnesses disagree about what happened after Frear answered the door. Titsworth testified that when Frear came to the door, he asked Frear to turn the music down and that Frear "grinned at me and he said that he could not hear me." Titsworth stated that after he asked two more times for Frear to turn the music down, Frear asked, " 'What's wrong, is it after the music curfew?' " Titsworth then asked Frear to turn the music down so they could talk. Frear, who had been holding the storm door open, subsequently turned, walked away, and released the storm door so he could, presumably, go turn the music down. Titsworth initially testified at trial that as the storm door was closing, he propped the door open with his knee. Titsworth testified that Frear then turned around and told him to get out of his house, to which Titsworth answered that he was not in the house. Titsworth explained that Frear then "hit me twice. He hit me in the lower right lip and on the left cheekbone, and I saw

that he hit me in the lower right lip with his open left hand, and I did not see whether his right hand was open or closed . . . ." Titsworth testified that he had marks on both sides of his face from being hit, that he had not touched Frear prior to Frear's hitting him, and that he never entered Frear's house.

Titsworth wrote two police reports concerning this incident. Titsworth was questioned concerning one of those reports, in which he indicated, contrary to his earlier testimony at trial, that the "door went closed and I pulled the door open." He explained, "I do not recall whether the door actually went closed and I pulled it shut [sic] or I stopped it with my knee." Regardless, Titsworth was sure that he did not enter the house.

The State also called Dubbs, who testified that as Frear turned around, presumably to turn the music down, Frear

> let go of the storm door and the storm door started to close and Officer Titsworth attempted to keep the door from closing, but it bounced off his knee and closed, so he just reached up and opened the door, and at that point Mr. Frear turned around and shoved him in the face with both hands.

Dubbs also testified that Titsworth never entered the house.

Frear testified at trial that Titsworth did enter the house. Frear testified that he let go of the storm door, shut the inside door, took two steps, heard his brother say something to him, turned around, and realized that Titsworth had put his hand on the doorknob, had a foot in his house, and was coming inside. Frear testified that he told Titsworth, "[H]ey, man, you can't come in here, I told you to stay outside, and I pushed him with one hand out the door." Frear explained that Titsworth's response was to slap Frear's hand away. Frear testified that he stopped pushing Titsworth as soon as Titsworth was outside the door. Frear admitted that he had had a couple of "Jack and Cokes" at a bar earlier that night and then had had a couple of beers at home.

Titsworth stated that after Frear hit him, he grabbed Frear by the neck of the shirt and pulled Frear out of the house, down the front steps, and onto the lawn. Once Frear was on the lawn, Dubbs advised him that he was under arrest for assaulting a police officer, and Titsworth and Dubbs handcuffed Frear.

Frear's account of this portion of the events is substantially the same, except Frear testified that neither Titsworth nor Dubbs advised him that he was under arrest until he was being handcuffed, and then they did not tell him why he was under arrest. At trial, a great deal of testimony was elicited describing both the police officers' actions and Frear's actions while they were on the front lawn. Both Titsworth and Dubbs described Frear as being resistant and uncooperative and testified that they had to use "knee strikes" and eventually had to "hobble" him in order to restrain and control him so that "no one would be injured."

On November 3, 1995, an information was filed in district court charging Frear with disturbing the peace, in violation of Neb. Rev. Stat. § 28-1322 (Reissue 1995), and with third degree assault on a police officer, in violation of § 28-931. At the arraignment, Frear initially wished to proceed without counsel but later changed his mind and requested that counsel be appointed for him, which was done.

On January 16, 1996, Frear made a motion requesting that he be recognized as cocounsel. After taking the motion under advisement, the district court denied the request. Once the court overruled Frear's motion that he be allowed to serve as cocounsel, Frear's counsel then requested that Frear be allowed to participate in certain parts of the trial. The district court also overruled that motion.

At the close of the State's evidence, Frear's counsel moved for a directed verdict concerning the disturbing the peace charge, which the district court granted. At the close of Frear's case, Frear's counsel proposed that four jury instructions (one concerning self-defense and three concerning police use of force when making an arrest) be given, which the court denied. Those proposed instructions, along with the court's rationale for denying them, will be detailed later.

The jury found Frear guilty of third degree assault on a police officer. A presentence investigation was completed, and Frear was sentenced to 12 months' probation.

## ASSIGNMENTS OF ERROR

Frear alleges the district court erred in denying his motion to serve as cocounsel and in denying his proposed jury instructions.

## ANALYSIS

*Frear's Right to Serve as Cocounsel.*

On appeal, Frear argues, "It was error for the trial court to overrule the Defendant's request to act as co-counsel in his trial." Brief for appellant at 6.

In response, the State cites *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984), and argues that Frear has no Sixth Amendment right to act as cocounsel and that a trial court is not required to permit " 'hybrid representation.' " Brief for appellee at 3. In *McKaskle*, the defendant was allowed to proceed pro se with standby counsel, and the U.S. Supreme Court cited *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (holding that defendant has right to represent himself or herself), and explained that "*Faretta* does not require a trial judge to permit 'hybrid' representation of the type Wiggins was actually allowed." *McKaskle*, 465 U.S. at 183.

In Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 11.5(f) at 556 (2d ed. 1992), it is explained that hybrid representation occurs when a "defendant and counsel act, in effect, as co-counsel, with each speaking for the defense during different phases of the trial." Other states have adopted a similar definition of hybrid representation. *State v. Murray*, 184 Ariz. 9, 27, 906 P.2d 542, 560 (1995), states that hybrid representation involves "concurrent or alternate representation by both defendant and counsel" and holds that a defendant has no constitutional right to hybrid representation, although the trial court can permit it at its discretion. Hybrid representation has also been considered to "encompass both the participation of the defendant in the conduct of his trial when he has not effectively waived the assistance of an attorney to defend him, and the participation by an attorney in the conduct of the trial when the defendant is defending pro se." *Metcalf v. State*, 629 So. 2d 558, 562 (Miss. 1993). *Lockhart v. State*, 671 N.E.2d 893, 898 (Ind. App. 1996), defines hybrid representation as "the right to proceed *pro se* and to be represented by counsel at the same time." Under these definitions, hybrid representation includes both a defendant's request to serve as cocounsel and a defendant's request for standby counsel.

Several other states have held that a defendant does not have the right to serve as cocounsel, and those states have adopted an abuse of discretion standard when appellate courts review such cases. In *Com. v. Williams*, 270 Pa. Super. 27, 34, 410 A.2d 880, 883 (1979), the court concluded:

> There is, however, a distinction between the constitutional right to proceed *pro se* pursuant to a valid waiver of the right to counsel and a right to proceed *pro se* and with counsel. While we have unearthed no Pennsylvania cases disposing of this precise issue, numerous other courts have considered the question in the wake of *Faretta, supra. Those courts have held with near unanimity that a criminal defendant has no sixth or fourteenth amendment right to act as co-counsel* where he is already represented by an attorney and that a decision to permit such "hybrid" representation is better left to the . . . sound discretion of the trial court. We find no persuasive reason to hold otherwise.

(Emphasis supplied.)

The court in *U.S. v. Stevens*, 83 F.3d 60 (2d Cir. 1996), concluded that the district court did not abuse its discretion when refusing to allow the defendant to serve as cocounsel because the district court determined that it would have been disruptive and because the defendant was not claiming undue prejudice or inadequate representation. See, also, *U.S. v. Olano*, 62 F.3d 1180 (9th Cir. 1995) (holding that defendant has no right to hybrid representation and that appellate court reviews decision of district court for abuse of discretion); *People v. Kirkpatrick*, 7 Cal. 4th 988, 874 P.2d 248, 30 Cal. Rptr. 2d 818 (1994) (holding that record should reflect defendant was represented by counsel or elected to proceed pro se and that defendant cannot be represented by counsel and proceed pro se at same time); *Lock v. State*, 273 Ind. 315, 403 N.E.2d 1360 (1980) (holding that it is in trial court's discretion to allow defendant to act as cocounsel); *State v. McKessor*, 246 Kan. 1, 12, 785 P.2d 1332, 1340 (1990) (holding that defendants have no right to hybrid representation and that "defendant who accepts counsel has no right to conduct his own trial or dictate the procedural course of his representation by counsel"); *State v. Booker*, 444 So. 2d 238

(La. App. 1983) (holding that defendant does not have right to both be represented and serve as representative).

While Nebraska courts have not considered whether a defendant has a right to act as cocounsel, Nebraska courts have addressed whether a defendant has a right to have standby counsel appointed while representing himself or herself. In *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991), Green requested a 2-week continuance at the arraignment so that he could determine whether he wanted to hire an attorney or to represent himself. When he appeared before the court 2 weeks later, he still had not hired an attorney, expressed dissatisfaction with local attorneys, and requested another continuance, which the court denied. Green thereafter represented himself at all proceedings before the trial court. On appeal, Green argued that the trial court should have appointed standby counsel for him.

In *Green*, the Supreme Court acknowledged that allowing standby counsel could interfere with the "orderly progression" of the trial and that appointment of standby counsel could interfere with a defendant's right to self-representation. *Id.* at 337, 470 N.W.2d at 745. The court concluded that the trial court is the best judge of such factors and therefore adopted an abuse of discretion standard of review. In Green's case, the court determined that the trial court did not abuse its discretion given Green's antagonism toward the local bar and because Green did not request that the trial court appoint standby counsel for him.

Since the notion of hybrid representation would include Frear's request to serve as cocounsel, the district court could, in its discretion, have allowed Frear to serve as cocounsel but was not required to do so. See, *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); *Green, supra*. The district court denied the motion and explained, "I want someone in charge of the case so I know who has primary responsibility." Frear was represented by counsel, and the district court expressed a valid and sound reason for denying Frear's request to act as cocounsel. The district court did not abuse its discretion in denying Frear's request to serve as cocounsel.

*Jury Instructions.*

Frear argues that it was error for the district court to refuse to give his tendered jury instructions.

*State v. Myers*, 244 Neb. 905, 911-12, 510 N.W.2d 58, 64-65 (1994), establishes the standard of review concerning the trial court's refusal to give a requested jury instruction:

> To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

See, also, *State v. Lomack*, 4 Neb. App. 465, 545 N.W.2d 455 (1996).

Frear proposed three jury instructions, found in the record as exhibits 3, 4, and 5, concerning the use of force by police officers when making an arrest. Since all three jury instructions deal with the police officers' use of force when making an arrest, we jointly address these instructions, as the same legal analysis applies to all three instructions. The first instruction Frear proposed is based upon Neb. Rev. Stat. § 28-1412 (Reissue 1995) and states:

> A police officer may use force to effect an arrest of a person only if that officer believes the force is immediately necessary to effect a lawful arrest. The use of force by a police officer to effect an arrest is not justifiable unless:
>
> (a) the police officer makes known the purpose of the arrest or believes that it is otherwise known by or cannot reasonably be made known to the person to be arrested; and
>
> (b) when the arrest is made under a warrant, the warrant is valid or believed by the officer to be valid.

Frear's second jury instruction, which was based on *State v. White*, 209 Neb. 218, 306 N.W.2d 906 (1981), and also on § 28-1412, stated: "The law in Nebraska is that force is not to be used in making an arrest unless the arrester believes such force is immediately necessary to effect a lawful arrest." Frear's third jury instruction, used in *State v. Wallace*, 223 Neb. 465, 390 N.W.2d 530 (1986), stated:

> A police officer may use only reasonably necessary force when making an arrest. If you find that the police in

this case used unnecessary force in the Defendant's arrest, and that the Defendant used only necessary force to protect himself from the police officer's unnecessary force, you must find the Defendant not guilty.

The district court determined that resisting arrest was not an issue in this case and thus refused to give Frear's three proffered jury instructions.

This case concerns Frear's assault on Titsworth, and consequently, Frear's proposed jury instructions concerning Titsworth's use of force against him are simply inapplicable. In *State v. Bear Runner*, 198 Neb. 368, 252 N.W.2d 638 (1977), the defendant was charged with and found guilty of assaulting a police officer. On appeal, Bear Runner argued that the trial court erred in not giving the jury three proposed instructions concerning what force is justifiable when a police officer makes an arrest. Those proposed instructions were also based upon § 28-1412 (then codified as Neb. Rev. Stat. § 28-839 (Reissue 1975)). The *Bear Runner* court explained that it would have been erroneous to give such jury instructions in an assault on a police officer case, as such instructions were intended to be affirmative defenses for police officers to utilize in criminal prosecutions. Just as in *Bear Runner*, the evidence in this case does not warrant the giving of jury instructions based upon § 28-1412 which attempt to tell the jury about the level of force a police officer may lawfully use when making an arrest. This case is about an entirely different matter—force used against a police officer.

Frear was charged with assaulting a police officer, and § 28-931 defines assault on an officer in the third degree as follows:

A person commits the offense of assault on an officer in the third degree if he or she intentionally, knowingly, or recklessly causes bodily injury to a peace officer or employee of the Department of Correctional Services while such officer or employee is engaged in the performance of his or her official duties.

"Bodily injury" is defined as physical pain. *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991).

Frear himself admitted that he pushed Titsworth out the door. Both Titsworth and Dubbs testified that Frear either hit or "shoved" Titsworth in the face. Titsworth testified that "[i]t hurt" when Frear struck him. Thus, there was sufficient evidence for the jury to have found that Frear assaulted Titsworth at the front door.

Finally, we address Frear's proposed jury instruction concerning nondeadly use of force in self-defense, which stated:

> The Defendant acted in self defense if:
>
> (1) Officer Titsworth used, threatened to use or attempted to use force against the Defendant, and
>
> (2) under the circumstances as they existed at the time the Defendant reasonably believed that the force he used against Officer Titsworth was necessary to protect the Defendant against the force or threat of force which Officer Titsworth used against the Defendant.
>
> The fact that the Defendant may have been wrong in estimating the danger does not matter so long as there was a reasonable basis for what he believed and he acted reasonably in that belief.

Citing NJI2d Crim. 7.1. The district court found that the alleged assault by Frear on Titsworth occurred at the front door and concluded there was no evidence which warranted a jury instruction on self-defense.

NJI2d Crim. 7.1 is based upon Neb. Rev. Stat. § 28-1409 (Reissue 1995), which states in part:

> (1) Subject to the provisions of this section and of section 28-1414, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

Frear is entitled to have the jury instructed on his theory of defense if there is any evidence to support it. See *State v. Graham*, 234 Neb. 275, 450 N.W.2d 673 (1990). Under Nebraska law, in order for Frear to successfully claim self-defense, he must establish that (1) he had a reasonable and good-faith belief that force was necessary, (2) the force was

immediately necessary, and (3) the use of force was justified under the circumstances. See *id.*

All of the testimony at trial clearly establishes that if Frear assaulted Titsworth, the assault took place at the front door. While both Titsworth and Dubbs described Frear as struggling and resisting, neither testified that Frear hit them, kicked them, or in any way caused them to suffer physical pain while on the front lawn. Frear's testimony confirms that even though he was struggling, Frear did not kick, try to hit, or lash out at the police while he was on the front lawn because "[t]hat wouldn't be the smart thing to do." It is clear that if Frear assaulted Titsworth, the assault took place at the door.

■ The trial court was correct in concluding that the evidence did not warrant a jury instruction on self-defense, as there was no evidence that Frear's use of force (i.e., his assault) was immediately necessary. There was no testimony that Titsworth had any physical contact with Frear or was threatening or otherwise intimidating Frear prior to the alleged assault at the door. Therefore, Frear cannot claim that "Officer Titsworth used, threatened to use or attempted to use force against [him]," and consequently, Frear does not meet the first prong of his proposed jury instruction. In short, Frear had no reason to believe that there was an imminent threat toward him and that consequently the use of force was immediately necessary to protect himself. See *State v. Schroeder*, 199 Neb. 822, 826, 261 N.W.2d 759, 761 (1978) (holding that self-defense instruction was not appropriate where there was no evidence that defendant could have believed assault was "imminent" and that use of force was therefore "immediately necessary" to protect himself).

Frear argues that the district court refused to give these instructions because the judge "felt the assault occurred prior to the arrest," but Frear argues that "there was also a great deal of evidence presented that a jury might believe that the assault occurred not before the arrest but while the officers were making the arrest." Brief for appellant at 10. In short, Frear argues that the evidence shows that he could have assaulted the officer while the two officers were trying to arrest him.

■ Even if Frear assaulted Titsworth while being arrested, Frear cannot justify such an assault by claiming self-defense.

Subsection (2) of § 28-1409 (the self-defense statute) sets forth that "[t]he use of such force is not justifiable under this section to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful." The court in *State v. Bear Runner*, 198 Neb. 368, 252 N.W.2d 638 (1977), cited § 28-1409(2) (then codified as Neb. Rev. Stat. § 28-836(2) (Reissue 1975)) and determined that this section of Nebraska law is identical to a provision of the Model Penal Code. The court quoted the comments to the Model Penal Code which explain, " 'It should be possible to provide adequate remedies against illegal arrest, without permitting the arrested person to resort to force — a course of action highly likely to result in greater injury even to himself than the detention.' " 198 Neb. at 374-75, 252 N.W.2d at 642. Even assuming that Frear did assault Titsworth incident to an arrest, and we can find no evidence of that, the Nebraska Legislature has determined that Frear cannot lawfully use force to defend against an arrest— even an unlawful arrest.

Thus, even considering Frear's testimony that Titsworth opened the door and stepped into the house, we cannot conclude that Frear had a reasonable belief that assaulting Titsworth was immediately necessary to protect himself from Titsworth. Even if Titsworth had entered the house with the intent of illegally arresting Frear, under Nebraska statutes, Frear cannot claim self-defense as a legal justification for his use of force against Titsworth, a uniformed police officer.

## CONCLUSION

We affirm the district court's determination that Frear was not entitled to act as cocounsel and that the evidence in this case did not warrant giving Frear's proposed jury instructions concerning self-defense and the use of force by police officers when making an arrest.

AFFIRMED.