STATE OF NEBRASKA, APPELLEE, V.
THOMAS A. WILSON, APPELLANT.
564 N.W.2d 241

Filed June 13, 1997.    No. S-96-525.

Michael J. Tasset, of Johnson and Mock, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.

In 1986, a jury convicted Thomas A. Wilson of second degree murder and use of a firearm in the commission of a felony in connection with the shooting death of his son, Robert Paul Wilson, on August 31, 1983. He received consecutive sentences of 35 years' imprisonment on the second degree murder charge and 6 to 20 years' imprisonment on the firearm charge. We affirmed the convictions in *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987). After successfully petitioning for postconviction relief, Wilson was retried and convicted of both charges in the district court for Douglas County in April 1996. He was sentenced to 50 to 60 years' imprisonment on the second degree murder charge and 6 to 20 years' imprisonment on the firearm charge, with the sentences to run consecutively and credit for time served. Wilson now appeals those convictions and sentences. Finding no prejudicial error, we affirm.

## FACTS

The circumstances pertaining to the August 31, 1983, shooting are summarized in *Wilson, supra*, and will not be repeated here except to the extent pertinent to the issues raised in this appeal.

Wilson appeared at his arraignment on August 4, 1995, with Clarence Mock, an attorney who had been appointed by the court on July 28, 1995, to represent him. At the arraignment, the prosecutor asked whether several pending motions which Wilson had filed on his own behalf would be withdrawn because Wilson had an appointed counsel. Wilson replied, "I've asked for counsel, if you've noticed, to assist me, not to be appointed to defend me, but to assist me. In other words, where we can work together." The court stated that the issue of representation would be taken up at a future hearing and that Wilson would be advised regarding his Fifth and Sixth Amendment rights if he decided to represent himself with an appointed legal advisor. The court suggested Wilson discuss these issues with Mock before the next hearing.

At a status hearing on August 10, 1995, the district court stated it wanted to schedule a hearing regarding Wilson's request to represent himself. The court advised Wilson that it

wanted to give him additional time to get acquainted with Mock and that perhaps, Wilson would change his mind about wanting to appear pro se because "the statistics on people representing themselves especially in serious cases is not very good." The court then scheduled a hearing to deal with this issue on September 13.

Wilson appeared with Mock at the hearing on September 13 and informed the court that he was "going to cooperate with the attorney by working together." The court again asked if he was going to act as his own counsel. Wilson replied, "I'm going to participate." The court told Wilson that he had not answered the question, and Wilson stated, "I'm not waiving my right to an attorney, if that's what you're asking me." Thereafter, the court stated, "All right. So you would like to have counsel?" Wilson did not respond. Mock then requested a few minutes to speak with Wilson, and the court ordered a short recess. When the parties returned, the court stated on the record:

> Mr. Wilson, maybe it would help if I talked a little bit about what a lawyer does in a criminal proceeding. As a defendant in a criminal action, you always have the right to direct your own defense whether you have a lawyer or not. And I don't want you to think that if you have counsel represent you in your trial, that you're turning over control of your case to someone else. You still have a right to make all of the crucial decisions that are going to go into the trial of this case from your perspective. But I need to know whether or not you want to have a lawyer represent you in this proceeding. If you do, I would designate counsel to represent you.
>
> And the difference between having someone represent you in the trial and having someone assist you is that if you have counsel representing you in the trial, that person is assuming professional responsibility for your defense. If you do not have a lawyer, but if you simply have an assistant at trial, there would be someone there for you to utilize as a legal resource. But that person would have no responsibility for representing you in the trial and would be a passive resource for you if you wanted advice. There's a big difference between having a lawyer repre-

sent you and having an assistant there to go to when you have a question.

Wilson told the court that he had represented himself in previous prosecutions and that he understood the responsibility it put on him. He then stated that "now you're telling me that I have a right to make the decisions . . . . And under them circumstances, certainly, I would love to have a lawyer." The court again asked Wilson if he wished to be represented by counsel, and Wilson answered affirmatively. Mock therefore continued as counsel of record for Wilson.

On December 11, 1995, Wilson appeared with Mock at a bond hearing. During the hearing, Wilson discussed his first trial in which he was represented by a deputy public defender. Wilson also complained that he had recently been unable to have documents copied in jail because he was represented by an attorney. He then stated, "I say, I'm still pro se. I have an attorney to assist me. But everybody in the world, from the beginning to the end, even up to this point, has done everything in the world to deter me from trying to go on and bring out the truth." The court interrupted Wilson, stating:

> I've had a chance to read through some of the appellate opinions in the Federal Courts involving former prosecutions and you. And I know that you have always attempted to insinuate yourself into the proceeding, even when you've been represented by counsel, and that you have participated personally in other prosecutions. And so I know that what we're dealing with here is a process that's not unfamiliar to you.

During a hearing on pending motions held on January 8, 1996, Wilson appeared with Mock but attempted to address the court. When the court instructed him to let Mock speak on his behalf, Wilson stated, "Well, I'm representing myself." The court reminded Wilson that he was represented by counsel, but Wilson insisted, "I want to represent myself." The court then advised Wilson that if he wished to represent himself, Mock would no longer serve as his attorney of record but would remain in the case as his legal advisor. The court further explained that under this arrangement, Wilson would be acting as his own lawyer and that Mock would not actively participate

in the trial but would be available to advise Wilson. Wilson responded, "Very well."

The district court then expressed its belief that Wilson understood the difference between representation by counsel and self-representation from his prior criminal prosecutions. The court nevertheless explained the charges against him, the nature of the State's burden of proof, his right to a trial by jury, the presumption of innocence, and his privilege against self-incrimination. The court also explained the difference between an advocate and a witness, and the necessity of maintaining that distinction when acting as one's own attorney. The court further ascertained that Wilson was not under a doctor's care or taking any prescription medication and that he had not consumed any alcohol, drugs, or mood-altering substances within the previous 24 hours. The court asked Wilson if anyone had threatened, coerced, or promised him anything in exchange for having him act as his own lawyer. Wilson replied that he had been "challenged" to defend himself and that he was going to do it because he was not able to reach the lawyer. Wilson again went into a detailed description of his first trial and his goals for the current litigation. During this hearing, the court made a finding that Wilson had freely, knowingly, and voluntarily waived his right to counsel, and it authorized Mock to withdraw as defense counsel but remain in the case as an advisor to Wilson.

Four days later, during a hearing on January 12, Wilson complained of the court's finding that he had waived his right to counsel, stating:

> I continuously asked and know that I am at an overwhelming disadvantage without counsel to assist me. But I asked for counsel — for effective assistance of counsel. I didn't ask for counsel to represent me, so I could participate in my trial. I'm not trying to say I don't need an attorney because I know I certainly will be at an awful disadvantage without an attorney professionally and truly assisting and guiding and helping me, see. But I mean—
>
> And then I would just like the record to know that I did not ask for not to have counsel or freely waive any right to counsel. I certainly pleaded and begged for counsel all

over the country. I've sent letters out all over the country looking for assistance of counsel.

The court reiterated that it had released Mock as defense counsel at Wilson's request and that Mock would act as Wilson's legal advisor. The court also informed Wilson that if he wanted Mock to appear as his attorney in the future, the relationship could be adjusted.

At a hearing on February 8, 1996, Wilson stated:

[A]fter a certain time, after I feel that I've been allowed to have my input, I will turn it over to my very trustworthy counsel and let him do his professional job as counsel. And I will shut up until I'm put on the witness stand, and I want the jury to know I will be on the witness stand, and I will answer any questions that is put to me by anybody.

The court announced that it intended to authorize a psychiatrist, Dr. Beverly Mead, to evaluate Wilson's ability to represent himself at trial.

Dr. Mead examined Wilson on February 14, 1996. In his report, Dr. Mead described Wilson as cooperative, eager, and willing to offer more information than necessary when asked a question. Dr. Mead informed Wilson of the purpose of the interview and recorded that Wilson

explain[ed] quite clearly but with much emotion that he had chosen to represent himself but was still asking for guidance and advice. He named an attorney, Clarence Mok, [sic] whom he said he respected and who could advise him, but he did not want him to represent him. He was told that the court should have no objection to this but he then explained that in order to have the "effective assistance of counsel" which he says the law allows, he feels it would be necessary for Mr. Mok [sic] to be allowed to speak in the court rather than just advising him in practice. This examiner explained that he did not know if this could be allowed unless Mr. Mok [sic] was actually serving as his attorney by taking action in his behalf. Mr. Wilson continued to argue that this was what he had already been told but he found nothing in the law to actually confirm this. He intended to made a point in the courtroom challenging this issue.

Dr. Mead concluded that Wilson did not suffer a disorder significant enough to consider him incompetent to stand trial in this case.

At a March 11, 1996, hearing, Wilson represented himself with one of Mock's associates appearing as his "court appointed legal advisor." Near the close of the hearing, the district court again brought up the subject of Wilson's representation, stating:

> I know you've done this before in other criminal prosecutions, and this won't be the first time that you've represented yourself.
>
> But just so the record will be complete that we have visited about this question, I want to be sure that you understand that if you were to have counsel represent you at trial and not just act as your advisors as they are now, that you would have the option to make what choices, strategy choices you choose, including testifying yourself. So if your choice to represent yourself in this proceeding is based upon your belief that that's the only way that you'll be permitted to testify in your own defense, you don't have to do that. Okay.

The following dialog then occurred:

> THE COURT: Okay. What I'm suggesting to you is that in this trial if you have Mr. Mock and his associates represent you, you'll still be able to make those strategic choices whether —
>
> THE DEFENDANT: Oh, I will?
>
> THE COURT: Sure.
>
> THE DEFENDANT: Beautiful. I would love to have them represent me.
>
> THE COURT: But you need to understand that if they're going to represent you at trial, they will represent you. I will not —
>
> THE DEFENDANT: Allow me to —
>
> THE COURT: I will not permit a situation to occur where they ask questions for a while and then you ask questions for a while.
>
> THE DEFENDANT: Yeah. I understand.
>
> THE COURT: Then they ask question for a while.
>
> THE DEFENDANT: Right.

The court determined that it would not "switch gears" that day but wanted Wilson to understand his options and that the question of Wilson's waiver of a right to counsel would be taken up again before trial commenced.

The first day of trial was April 2, 1996. On that date, Wilson appeared with Mock acting as his court-appointed legal advisor. Before the trial began, the court stated it understood Wilson would be representing himself and inquired of Wilson if that understanding was correct. Wilson responded that it was. The court again informed Wilson of the possible consequences of self-representation and explained Mock's role if he acted as an advisor. The court also explained, in detail, the process of jury selection, the charges against Wilson, and his rights as a defendant. The following dialog then occurred:

THE COURT: . . . And throughout this process, you're entitled to counsel. I understand that you have and you continue to insist that you wish to represent yourself. Is that accurate?

THE DEFENDANT: I wish to speak — yes, and represent myself with the effective assistance of counsel.

THE COURT: . . . you are entitled to reasonably effective assistance of counsel to ensure that a trial is fair. You have chosen, however, to forego that right.

THE DEFENDANT: No. No. Definitely I have not done that.

THE COURT: I'm not asking you to agree with me, and I'm not asking you to accept this. I am telling you that is what you've done. You have voluntarily agreed to forego your right to effective counsel and the ability that effective counsel have to ensure that the trial process is fair. What you have in place of that is a lawyer who will advise you of this if you take questions to him, he will do his best to answer those questions as the trial progresses.

Wilson represented himself during voir dire and in the initial days of trial, with Mock present as his legal advisor. On the third day of trial, before the jury was brought in, Wilson informed the court that Mock told him he was "totally getting walked over" because he was not recognizing and objecting to improper questions by the prosecutor. Wilson then stated:

You know, so I wanted to turn the case over to him to question witnesses because he's trained in that — in law and the proper way of doing that. And I agreed with him. So I said, okay, but I want it understood that I take the stand. And he said, well I understand that. I said, you know, so if I turn the case over to you, that don't mean I got to do as you see fit and not take the stand. I don't want to go through that again, see. And then you says that I can't do that. I can't switch in midstream. So I said, okay. So I — then I keep reading law. And it says here, however, the right of a party who has appeared in pro se — it says another word — subsequently to associate himself with an attorney in conduction of the case has been recognized. And a party who elects to employ counsel at any stage — any stage of the proceedings may not be deprived of counsel's service for the reason that he has therefor appeared in person.

The court explained that it had not understood that Wilson wished to withdraw his waiver of his constitutional right to counsel and asked him if that was, in fact, what he was doing. Wilson did not answer directly, and the court then stated:

[W]e're either going to do it one way, or we'll do it the other way. I want you to be your own lawyer, or I want Mr. Mock to represent you, but I don't want to do both of them. I told you the other day, we can't split up duties, have you do some things, have Mr. Mock do some things, and then have you do some more things. You can be your lawyer, represent yourself through the rest of this trial, or we can ask Mr. Mock whether he'd be willing to resume your defense with your commitment that he would act as your lawyer through the rest of the proceeding, understanding that you have the right to make your own choice with regard to testifying in your own defense.

After further discussion, the court recessed to permit Wilson to confer privately with Mock. When the court reconvened, the judge asked if Wilson had a chance to visit with Mock. Wilson said that he had. Wilson then stated:

Well, Mr. Mock says that he can't do it my way. And he wouldn't subpoena the people that I feel that could or

would help in my defense, and he can't help me get them records of the proceedings that went on before this that I wanted to — in order to prepare my defense.

Further discussion ensued, and the court asked Wilson, "So at this point you're going to continue representing yourself?" Wilson replied, "Right."

During trial, Wilson argued that the fatal shot was fired while he was struggling with his son in an attempt to take the gun away from him. A prosecution witness testified that she observed Wilson holding the gun some distance away from his son and moving toward him immediately after the fatal shot was fired.

Omaha police Capt. Anthony Infantino testified as a witness for the State. During cross-examination conducted by Wilson, Infantino testified that he observed what appeared to be a "close contact wound from a firearm" on the body of Wilson's son when he examined it at the hospital. He testified that such a wound would result from the firearm being held "right up against the person's body" at the time the shot was fired. This testimony was consistent with Wilson's contention that the gun was fired at very close range.

In his closing argument, the prosecutor attempted to discredit Infantino's characterization of the wound by arguing that Infantino was not a homicide detective and that he had only attended approximately 12 autopsies, which was supported by the record. The prosecutor then stated:

This is the same Captain Infantino . . . who several weeks ago told the community that a police officer had shot another police officer in executing a search warrant. And then a few days later after the experts looked at it said, wait a minute. It wasn't a police officer shooting.

Wilson immediately objected, and the district court sustained the objection, stating in the presence of the jury that "[t]he prior observations about Captain Infantino are not a matter of record in this case." Wilson did not move for a mistrial.

On April 12, 1996, the jury found Wilson guilty of murder in the second degree and of use of a firearm in the commission of a felony. After ordering a presentence investigation, the court sentenced Wilson on April 23 to 50 to 60 years' imprisonment

for second degree murder and 6 to 20 years' imprisonment for use of a firearm to commit a felony, with the sentences to be served consecutively. Wilson was given credit for 3,758 days served since his original convictions.

## ASSIGNMENTS OF ERROR

Wilson claims the trial court erred in (1) finding that he intelligently and voluntarily, with knowledge of his right to counsel, waived his right to counsel; (2) failing to order a mistrial following prejudicial remarks made by the State in its closing; and (3) subjecting Wilson to harsher sentences than he had received as a result of his convictions in an earlier trial on the same charges.

## STANDARD OF REVIEW

A waiver of the Sixth Amendment right to counsel is valid only when it reflects an intentional relinquishment or abandonment of a known right or privilege; therefore, the key inquiry is whether one who waived the Sixth Amendment right was sufficiently aware of the right to have counsel and of the possible consequences of a decision to forgo the aid of counsel. *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994).

On questions of law, an appellate court has an obligation to reach its own conclusions independent of those reached by the lower courts. *Spulak v. Tower Ins. Co.*, 251 Neb. 784, 559 N.W.2d 197 (1997); *State v. Adams*, 251 Neb. 461, 558 N.W.2d 298 (1997).

## ANALYSIS

### WAIVER OF RIGHT TO COUNSEL

In his first assignment of error, Wilson claims the district court erred in finding that he "intelligently and voluntarily, with knowledge of his right to counsel, waived his right to counsel under the Sixth and Fourteenth Amendments [to] the Constitution of the United States and Article I, § 11 of the Constitution of the State of Nebraska."

An accused has a state and federal constitutional right to be represented by an attorney in all critical stages of a criminal prosecution which can lead to a sentence of confinement. See,

U.S. Const. amend. VI and XIV; Neb. Const. art. I, § 11; *Scott v. Illinois*, 440 U.S. 367, 99 S. Ct. 1158, 59 L. Ed. 2d 383 (1979); *Argersinger v. Hamlin*, 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972); *Dean, supra.* The same constitutional provisions also guarantee the right of an accused to represent himself or herself. *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991).

A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial.

*McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984).

In order to exercise the right of self-representation, a defendant must first make a knowing and intelligent waiver of the right to counsel. *Faretta, supra*; *State v. Dodson*, 250 Neb. 584, 550 N.W.2d 347 (1996); *Green, supra*; *State v. Jost*, 219 Neb. 162, 361 N.W.2d 526 (1985). A defendant contemplating self-representation "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*, 422 U.S. at 835, quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 63 S. Ct. 236, 87 L. Ed. 268 (1942). An effective waiver of the federal constitutional right to counsel is sufficient to waive the right to counsel under our state Constitution. *Dean, supra.* The State has the burden of establishing a knowing and intelligent waiver of a defendant's constitutional right to counsel. *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986); *Green, supra.*

In determining whether there has been a knowing and voluntary waiver of the right to counsel, the key inquiry is whether the defendant was sufficiently aware of the right to have counsel and of the possible consequences of a decision to forgo the aid of counsel. See *Dean, supra.* A knowing and intelligent waiver can be inferred from conduct. Consideration may also be

given to a defendant's familiarity with the criminal justice system. *Meyer v. Sargent*, 854 F.2d 1110 (8th Cir. 1988); *Green, supra.* The waiver of constitutional rights must be done with sufficient awareness of the relevant circumstances and likely consequences. *Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970). At a minimum, the determination of whether a waiver is knowing and intelligent requires that the accused be made sufficiently aware of the right to have counsel present and of the possible consequences of a decision to forgo the aid of counsel. *Green, supra.* We have held that a "trial court should warn a defendant who has the right to counsel of the dangers and disadvantages of self-representation, but that the warning is not required." *Id.* at 335, 470 N.W.2d at 744.

Viewing the record in its entirety, we conclude that Wilson knowingly and intelligently waived his Sixth Amendment right to counsel in order to exercise his *Faretta* right to self-representation. Wilson had personal experience upon which to evaluate his options. He had been represented by counsel in his first trial on the charges of second degree murder and use of a firearm in the commission of a felony. Previously, he had represented himself with an appointed legal advisor in a federal prosecution for receiving stolen goods. *United States v. Wilson*, 523 F.2d 828 (1975).

Although not required to do so under *Green*, the district court repeatedly advised Wilson of the potential dangers of self-representation. The court also urged Wilson to discuss the matter with his appointed counsel before making any final decisions to represent himself.

Wilson contends that his waiver of counsel on the first day of trial was not *knowing and voluntary* because he had previously been misinformed by the district court about the degree of control which he could personally exert over his defense if he chose to exercise his right to counsel. We disagree. Although the district court did inform Wilson on several occasions that he would retain certain *control* over his defense if he exercised his right to counsel, it is clear from the context of these remarks that the court was simply advising Wilson that if he were represented by an attorney, he would have input with respect to strategic and tactical decisions made by the defense counsel, but would not

be permitted to personally conduct the defense. Wilson clearly understood that he could personally control and present his case only if he proceeded pro se; this is precisely why he insisted on representing himself.

Wilson's understanding of the distinction between representation by counsel and self-representation is evident from his own words to the jury during his opening statement. After introducing Mock to the jury as "my dependable, trustworthy, and helpful advisor," Wilson stated:

> I stand here before you talking because the trial tactics and strategy and duty is — is the duty of the one charged with representation of the defendant's presentation of the case. And if the defendant represents him or herself, then and only then can they make those decisions, those rough decisions concerning tactics and strategy. . . .
>
> . . . .
>
> Am I doing the right thing trying to be heard in my own words? I've been told by everybody that all you people are going to get mad at me for trying to explain it the way I am. I went the first time with the lawyer. I was told I couldn't do this; I couldn't do that. So this time I worked very hard, over ten years to learn something about how to present something to you people to bring forth the truth and bring forth what's going on here.

Wilson added later in his opening statement, "And please, please, don't hold it against me for being here and not allowing Mr. Mock to do this."

A defendant may not use "his or her right to counsel to manipulate or obstruct the orderly procedure in the court or to interfere with the fair administration of justice." *State v. Green*, 238 Neb. 328, 336, 470 N.W.2d 736, 745 (1991). Accord *State v. Denbeck*, 219 Neb. 672, 365 N.W.2d 469 (1985). The record reflects that Wilson attempted to do just that by repeatedly insisting that he was not waiving his right to counsel because he was "representing [him]self with the effective assistance of counsel." In essence, Wilson insisted on appearing pro se as cocounsel with his appointed attorney. The district court repeatedly advised Wilson that this would not be permitted. Wilson's

comments to Dr. Mead reflect that he understood what the court was telling him but disagreed with it.

While we have not ruled on the precise issue of whether a pro se defendant has a right to serve as cocounsel with an attorney appointed to represent him, the Nebraska Court of Appeals has recently held that this type of "hybrid representation" is not a matter of right but is left to the discretion of the trial court. *State v. Frear*, 5 Neb. App. 578, 561 N.W.2d 591 (1997). See, also, *U.S. v. Stevens*, 83 F.3d 60 (2d Cir. 1996) (holding that trial court did not abuse its discretion in refusing to allow defendant to serve as cocounsel); *U.S. v. Olano*, 62 F.3d 1180 (9th Cir. 1995) (holding that there is no constitutional right to hybrid representation); *People v. Kirkpatrick*, 7 Cal. 4th 988, 874 P.2d 248, 30 Cal. Rptr. 2d 818 (1994) (holding that defendant cannot be represented by counsel and proceed pro se at same time); *Lock v. State*, 273 Ind. 315, 403 N.E.2d 1360 (1980) (holding that it is within trial court's discretion to allow defendant to act as cocounsel). We agree with the analysis of the Court of Appeals in *Frear* and hold that the district court may, in its discretion, allow a pro se defendant to act as cocounsel with appointed counsel but is not required to do so.

In this case, the district court made it clear that it would not permit Wilson to have a cocounsel relationship with his appointed counsel but would designate counsel as a "legal advisor" if Wilson insisted on conducting his own defense. We have held that the appointment of standby counsel for a pro se defendant is within the discretion of the trial court. *Green, supra*. This holding is consistent with the rights outlined by the U.S. Supreme Court. In *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984), the defendant was pro se and had standby counsel. The Court stated that while *Faretta* gave a defendant the right to proceed without counsel, it did not require a court to permit the hybrid representation that Wiggins was granted. In this case, after the court determined that Wilson knowingly and intelligently waived his right to counsel and asserted his *Faretta* right to self-representation, it properly exercised its discretion to designate Wilson's former appointed counsel as a "legal advisor" to Wilson. As we have noted, the fact that Wilson had the advice of counsel throughout his pros-

ecution is further indication that his waiver of counsel and election to represent himself was knowing and voluntary.

This is not a case where the accused exercised his or her right to counsel because the accused was misinformed about the degree of control he or she could exercise over his or her defense if represented. To the contrary, Wilson waived his right to counsel and exercised his right of self-representation with full knowledge and understanding that this was the only way in which he could personally control and present his own defense by conducting voir dire, addressing the jury directly during opening statement and closing argument, and personally cross-examining the State's witnesses. A waiver of counsel need not be prudent, just knowing and intelligent. *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991). The record clearly demonstrates that Wilson knowingly and intelligently waived his right to counsel, and his first assignment of error is therefore without merit.

## PROSECUTORIAL MISCONDUCT

Wilson next contends that the district court erred in not ordering a mistrial following the remarks made by the prosecutor concerning Captain Infantino in his closing argument. A prosecutor's closing argument must be based on evidence received during the trial. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994). The prosecutor's reference to Infantino's mistaken comments about an unrelated shooting violated this rule, since there was no evidence in Wilson's trial concerning those comments. Wilson made a timely and proper objection to the prosecutor's remark, and his objection was sustained. However, Wilson did not move for a mistrial.

A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. See, *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994); *State v. Parker*, 180 Neb. 707, 144 N.W.2d 525 (1966). Wilson admits that he made a tactical decision not to move for a mistrial because he did not want to remain incarcerated while waiting for a retrial and believed that the jury would "recognize and remember the State's strategy for the

improper tactic it was." Brief for appellant at 20. By not moving for a mistrial, Wilson failed to preserve any error created by the prosecutor's misconduct. See *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991).

An appellate court reserves the right to address plain error of such a nature that it would result in a miscarriage of justice or damage to the integrity, reputation, or fairness of the judicial process if not corrected. *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995); *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995). The prosecutor's argument based upon facts which he knew were not in the record was unquestionably improper and troublesome to this court. However, we cannot conclude from the record that this single remark to which an objection was sustained was so prejudicial to Wilson or injurious to the integrity of the legal process as to justify reversal on appeal under the plain error doctrine. Thus, Wilson's second assignment of error is without merit.

SENTENCING

In his final assignment of error, Wilson argues that the court erred in imposing a harsher sentence for the charge of second degree murder than he had received in the first trial on the same charge, without articulating aspects of Wilson's conduct subsequent to the first sentencing which justified the harsher sentence. In resolving this issue, we start with the decision of the U.S. Supreme Court in *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *rev'd on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989), which held that imposing a harsher sentence on the retrial of a criminal charge would violate due process of law if motivated by vindictiveness toward a defendant for having effectively attacked his or her first conviction. The Court concluded that in order to assure the absence of such a motivation, a judge imposing a more severe sentence on a defendant after a second trial must make an affirmative statement of his or her reasons for doing so, that those reasons "must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding," and that the factual basis establishing such conduct must be included in the record. 395 U.S. at 726.

In *Pearce*, the Court recognized that the Constitution does not impose an

> absolute bar to a more severe sentence upon reconviction. A trial judge is not constitutionally precluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." *Williams v. New York*, 337 U.S. 241, 245. Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources.

395 U.S. at 723.

Two cases decided by the U.S. Supreme Court subsequent to *Pearce* further define the Court's holding in *Pearce*. In *Wasman v. United States*, 468 U.S. 559, 568, 104 S. Ct. 3217, 82 L. Ed. 2d 424 (1984), the Court clarified its holding in *Pearce* by stating that "due process does not in any sense forbid enhanced sentences or charges, but only enhancement motivated by *actual vindictiveness* toward the defendant for having exercised guaranteed rights." The Court recognized that a judge or other sentencing authority "is to be accorded very wide discretion in determining an appropriate sentence" and should be permitted to consider "any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." 468 U.S. at 563. The Court noted that *Pearce* had been interpreted to hold that whenever a sentence on reconviction was more severe than the original sentence, there was a presumption of vindictiveness which could be rebutted by the sentencing court placing factual information on the record to justify the second sentence and to show that it was not motivated by vindictiveness. In holding that an unrelated criminal conviction after the imposition of the first sentence was a proper basis for enhancement even though the conduct which led to the conviction occurred prior to the first sentence, the Court concluded that "a sentencing authority may justify an increased sentence by affirmatively identifying relevant conduct *or events* that occurred subsequent to the original sentencing proceedings." (Emphasis supplied.) 468 U.S. at 572.

In *Texas v. McCullough*, 475 U.S. 134, 106 S. Ct. 976, 89 L. Ed. 2d 104 (1986), the Supreme Court held that a harsher sentence following the retrial of a murder case was justifiable on the basis of new evidence about the murder which came out for the first time in the second trial. The Court found that the "presumption of vindictiveness" was inapplicable, 475 U.S. at 138, because the second trial occurred on the court's own motion and different sentences assessed the first and second sentences. However, the Court stated, "Even if the *Pearce* presumption were to apply here, we hold that the findings of the trial judge overcome that presumption. Nothing in *Pearce* is to be read as precluding a rebuttal of intimations of vindictiveness." 475 U.S. at 141.

In *State v. Golden*, 230 Neb. 284, 286, 430 N.W.2d 900, 901 (1988), we interpreted *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *rev'd on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989), as permitting a harsher sentence following retrial "where events subsequent to the first trial had shed new light on the defendant's character and where the reasons for imposing a heavier sentence appeared in the record." However, in that case, we held that a harsher sentence was not justified because the record contained no evidence of a material change in circumstances since the first sentencing. See, also, *State v. McArthur*, 230 Neb. 653, 655, 432 N.W.2d 839, 841 (1988) (holding that sentence void because "the record is devoid of any explanation for the increase in the minimum sentences"); *State v. Lopez*, 217 Neb. 719, 721, 350 N.W.2d 563, 565 (1984) (holding that no new or additional information "concerning either the facts of the offenses or adverse information concerning other past offensive conduct was presented").

However, prior to *Golden*, we upheld the imposition of a harsher sentence following retrial in *State v. Beach*, 215 Neb. 213, 337 N.W.2d 772 (1983), where the sentencing judge noted on the record that the retrial changed his perception of the defendant. The judge was convinced that the conduct for which the defendant had been convicted was far more serious than had appeared at the time the guilty plea led to the first conviction, for which the defendant had been placed on probation. Because

of this, the judge felt that imprisonment was essential following the second conviction.

We have held that in imposing a sentence, "a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime." *State v. Orduna*, 250 Neb. 602, 612-13, 550 N.W.2d 356, 363 (1996).

In this case, the district court noted certain "differences" between Wilson's first and second trials. The court observed that Wilson had changed his theory of defense from accident or suicide in the first trial to self-defense in the retrial. Additionally, at the first trial, a trip Wilson took to Florida was alluded to but was left largely unexplained. In the 1996 trial, it was discovered that the goal of the Florida trip was to rob a drug dealer for an associate of Wilson. Also in the first trial, there was sparse evidence of Wilson's personal life. In contrast, the 1996 trial revealed that Wilson had a background as a thief and a robber. The court also considered the fact that Wilson did not testify in the first trial but did in the 1996 trial and that his testimony was discredited by the jury. The court then stated that its primary objective was public safety and that it considered Wilson an "unrepentant murderer," who, in the interest of public safety, should be kept "in a very secure place for a long time." Because events in the second trial shed new light on the defendant's character and because the reasons for imposing a heavier sentence appeared in the record, any presumption of vindictiveness under *Pearce* is effectively rebutted. The district court, therefore, did not err in imposing a harsher sentence on Wilson following his reconviction for second degree murder.

We, therefore, affirm the judgment of the district court in its entirety.

AFFIRMED.