STATE OF NEBRASKA, APPELLEE, V.
DAVID L. DUNSTER, APPELLANT.

631 N.W.2d 879

Filed August 3, 2001.   No. S-00-106.

James R. Mowbray and Jerry L. Soucie, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## I. INTRODUCTION

David L. Dunster, proceeding pro se, pled guilty to the first degree murder of Larry R. Witt and to the use of a weapon to commit a felony. The trial court sentenced Dunster to death for Witt's murder and to not less than nor more than 20 years' imprisonment for use of a weapon. Pursuant to Neb. Rev. Stat. § 29-2525 (Reissue 1995), Dunster's automatic appeal was then docketed with this court.

## II. FACTUAL BACKGROUND

Sometime in the early morning hours of May 10, 1997, Dunster strangled his cellmate, Witt, with an electrical cord. Witt's body was discovered later that day.

On July 2, 1997, the district court appointed the Lancaster County public defender's office to represent Dunster. Attorney Michael Gooch from that office then appeared on Dunster's behalf. On November 18, 1998, an arraignment was conducted in the district court. Dunster stood mute at the arraignment, and the court entered pleas of not guilty.

On June 8, 1999, the trial judge received a letter dated June 6, 1999, from Dunster. In this letter, Dunster pointed out that the State's list of potential trial witnesses included Lancaster County Deputy Sheriff Joseph Gehr. Gehr's mother was employed as the office manager for the public defender's office. Dunster expressed concern that because of this relationship, Gooch might not vigorously cross-examine Gehr at trial, and that confidential information regarding Dunster's case might have been shared between Gehr and his mother. Dunster requested that the public defender's office be disqualified as his counsel.

In this letter, Dunster also expressed dissatisfaction with the handling of his case by the public defender's office. Dunster claimed the public defender's office was investigating the existence of mitigating factors which could be presented in the event of a sentencing hearing. Dunster asserted that he did not want to present any mitigating evidence at sentencing and that investigating mitigating evidence was contrary to Dunster's instructions to the public defender's office.

On June 17, 1999, the court held a hearing on the issues raised by Dunster's letter. The prosecution, Dunster, and Gooch were present. At the court's request, Dennis Keefe, the elected Lancaster County public defender, testified regarding the confidentiality procedures at the public defender's office. In response to the court's questions, Keefe testified:

> MR. KEEFE: . . . [W]e have a written office policy about confidentiality, which goes beyond statutory attorney/client privilege and statutory secrets. And Ms. Gehr not only understands that policy, but is responsible for educating all of the other employees in the office when they're first

employed. And it is a policy that we strictly enforce. And if anyone violates the policy, it's written into the policy that it is grounds for immediate dismissal. We have never had a problem with that in any way, shape or form, and we will not in this case. . . .

THE COURT: When you say you have a policy, I presume the policy is that people are not allowed to disclose anything from within the office to anybody outside the office, paraphrasing?

MR. KEEFE: Exactly.

The prosecution also called Gehr. Gehr testified that he had been employed by the Lancaster County sheriff's office for approximately 9 years, during which time his mother had been employed as the office manager for the public defender's office. Gehr testified that the extent of his involvement in Dunster's case was limited to his being present at Witt's autopsy and writing a supplemental report on the autopsy. Regarding the possible conflict of interest, Gehr testified as follows:

[Prosecutor:] Have you at any time discussed your attendance at [Witt's] autopsy or anything else you may know about this case with your mother?

[Gehr:] No.

Q Prior to this afternoon, did you know that the Public Defender's Office was involved with this particular case?

A No.

Q Has your mother had any conversation with you about this case?

A No.

After Gehr's testimony, Dunster reiterated his concern that he had "no assurance" that Gehr and his mother might not exchange information about the case. The court took the issue under advisement.

The court then considered the other issue in Dunster's letter, wherein Dunster stated, " 'I have instructed them [the public defender's office] not to investigate or present any mitigating evidence at the sentencing phase' . . . . 'I've told my attorneys I do not want them investigating these issues, but they tell me that, notwithstanding my desires, they're going to investigate them anyway.' " The court stated to Dunster, "[Y]our feeling is

that they're not following your directions, therefore you want them discharged." Dunster responded, "Exactly."

The court then began discussing this issue with Gooch. During this discussion, Dunster interjected, saying:

> [Dunster]: I think I can solve this whole thing.
>
> THE COURT: That would be nice.
>
> [Dunster]: Okay. Disqualify the public defenders; let me withdraw my plea of not guilty; I plead guilty and then you sentence me to death. That's what I'm requesting, because I'd rather have that than live the rest of my life in a cell. Okay?
>
> . . . .
>
> THE COURT: . . .. Mr. Dunster, I would not unilaterally discharge the Public Defender's Office. You obviously have a right to fire whomever you want to, and then I would have to make a decision whether — and if you tell me, "I'm going to go ahead and represent myself," then I would have to make a decision on whether you're aware of certain things and whether your decision is freely, voluntarily, knowingly and intelligently made on proceeding to represent yourself.
>
> . . . I want you to have an opportunity to sit down and talk with Mr. Gooch . . . .
>
> . . . .
>
> [Dunster]: I will not discuss anything further with the Public Defender's Office.

The court then told Dunster that it would appoint another attorney to talk with him about the ramifications of discharging the public defender's office and representing himself. Dunster responded, "Well, common sense tells me that's stupid to represent myself. I mean, I don't know enough about the law, but I know what I want and then that's it."

The court then appointed the Nebraska Commission on Public Advocacy (NCPA) to advise Dunster on the ramifications of discharging the public defender's office and representing himself. The hearing was continued to allow Dunster time to consult with the NCPA.

The hearing resumed on July 2, 1999. The prosecution, Gooch, Dunster, and counsel from the NCPA were present.

During the hearing, Dunster stated he had been advised by the NCPA regarding his desire to discharge the public defender's office and to proceed pro se. Dunster then requested to withdraw "without prejudice" the issues raised in the June 8 letter. The court granted this request, and the public defender's office continued to represent Dunster.

On July 12, 1999, a pretrial hearing commenced regarding 33 motions Gooch had filed on Dunster's behalf. At the start of the hearing, Gooch informed the court that he would shortly be leaving the public defender's office and would not be available when Dunster's case came to trial. Dunster then requested that the NCPA immediately be appointed as his counsel. The court denied Dunster's request and determined that Dunster's case would be reassigned to a different public defender after the conclusion of the present hearing. Dunster responded, "It's a merry-go-round with attorneys . . . I don't get along with the Public Defender's Office." The court then reminded Dunster that the issue was not whether Dunster liked the public defender's office, but whether "the attorney can afford you effective counsel."

Various witnesses were then called to testify with respect to the 33 pretrial motions. The last witness called on July 12, 1999, was Investigator Kevin Knorr, who testified on behalf of the State regarding his investigation of Witt's murder. The hearing was then continued until July 13.

When the hearing resumed on the morning of July 13, 1999, the prosecutor disclosed to the court that after Knorr had finished his testimony on July 12, the prosecutor overheard Dunster say to Knorr, " 'If I could get out of these mother-fucking cuffs, I would break your mother-fucking neck.' " The prosecutor was concerned about the reoccurrence of such an outburst, the jury's security, and the possible need to shackle Dunster during trial.

After the prosecutor related this information to the court, the following exchange took place:

> MR. GOOCH: Your Honor, it strikes me that what the prosecutor is describing could be charged as felony terroristic threats. Pursuant to the code of professional responsibility, I believe that I should withdraw from the case because I think that I'm a potential witness.
>
> THE COURT: Not until anything's filed, are you?

MR. GOOCH: Oh, I think so.

. . . .

THE COURT: The request of Mr. Gooch to withdraw is denied.

After the court denied Gooch's motion to withdraw, Dunster presented the court with two motions, both prepared by Dunster. The first, a typed motion, requested that the public defender's office be discharged and that Dunster be allowed to proceed pro se. The second, a handwritten motion, requested the court to allow Dunster to withdraw his not guilty pleas and plead guilty to first degree murder and use of a weapon to commit a felony. The court spent the rest of the morning and a portion of the afternoon advising and questioning Dunster regarding his motions.

The court questioned Dunster concerning his reasons for discharging the public defender's office and advised Dunster of his right to counsel and of the possible consequences of any decision to forgo the aid of counsel. The court also advised Dunster of the nature of the charges against him and the possible penalties, including the possible imposition of the death penalty if his guilty plea to first degree murder was accepted. Dunster responded that he was aware of his rights, the charges, and possible penalties for his crimes. The court then explained to Dunster what would occur during trial.

The court further questioned Dunster as follows:

THE COURT: . . . Are you now under the influence of any alcohol, drugs, narcotics or other pills?

[Dunster]: Yeah, medication.

. . . .

[Q.] Does the medication affect your ability to understand what's going on around you?

[A.] No.

[Q.] Does it make you groggy or anything like that?

[A.] No.

[Q.] What effect does it have on you?

[A.] None.

[Q.] None?

[A.] None.

[Q.] None that you're aware of, at least?

[A.] None that I'm aware of.

Dunster stated that he was taking "mega-doses" of Prozac, "Depitol" (Depakote), and Librium. Dunster explained: "I weigh 300 pounds, so I — when I say mega-doses, they would be different than what they give her [the prosecutor] and what they give me." The court then asked, "What effect do those have on you?" Dunster responded, "None." The court further asked, "Do they affect your ability to understand what's going on around you?" Dunster responded, "No."

The court then questioned Dunster concerning his June 8, 1999, letter in which Dunster expressed concern regarding a possible conflict of interest in the public defender's office:

THE COURT: On July 2nd, 1999, we had another hearing. . . . It was my understanding, during that hearing, that you in fact withdrew the letter of June 6th, 1999, and those issues were not before me anymore, is that correct?

[Dunster]: At that time.

[Q.] At that time. And still are not before me, is that correct?

[A.] That letter is not before you.

[Q.] Okay.

[A.] The motions that I filed today are before you.

[Q.] That you filed today.

[A.] Yes.

[Q.] And the two motions you filed today were the motion to discharge the public defender and proceed to represent yourself, and the motion to change your plea.

[A.] Yes.

The court, after finding that Dunster's motion to discharge the public defender's office was made knowingly, intelligently, and voluntarily, granted the motion. The public defender's office was thereafter appointed as standby counsel.

The court then explained to Dunster that if he pled guilty to the charges filed against him, he would be waiving his right to confront witnesses against him, the right to a jury trial, and the privilege against self-incrimination. Dunster indicated that he understood these rights and wanted to plead guilty.

The court then read aloud the charges against Dunster which accused Dunster of murdering Witt with an electric cord. The court then asked Dunster, "Did this happen on or about May

10th, 1997?" Dunster responded, "Yes. . . . I used an extension cord, wrapped it around his neck, squeezed him until shit run down his leg." The State then presented evidence to support the factual basis for Dunster's guilty plea. At the conclusion of the hearing on July 14, 1999, the court accepted Dunster's pleas and found Dunster guilty of first degree murder and use of a weapon to commit a felony.

The court next explained that the proceedings would now move to the sentencing phase and how the sentencing hearing would proceed. The court stated, "Mr. Dunster, we've gone from phase 1 of this case, that is the guilt/innocence phase, now to the sentencing phase. I strongly urge you to have an attorney, to step aside and let the public defender represent you with respect to this phase." Dunster responded, "No." The court also explained that Dunster would have the right at the sentencing hearing to present any mitigating evidence. Dunster stated, "I'm not going to present any evidence." Dunster also expressed his impatience with the time involved before sentencing, stating:

> And I'm really getting pissed that you keep wanting to drag this out over and over, you know.
>
> . . . .
>
> . . . I can't believe that it's so hard. I mean, you have suicide by cop, and I'm trying to commit suicide by state, and it is difficult. I could — it is really a pain in the ass to get you people to kill me.

Thereafter, over Dunster's objections, the court stated that it would order a presentence report for purposes of sentencing. The hearing was then concluded.

On July 28, 1999, the trial court wrote to the probation officer who was compiling the presentence report, stating:

> [I]t is my understanding the Department of Correctional Services has information in its possession it is willing to release to you for inclusion as part of the presentence investigation report you are preparing in [State v. Dunster]; however, the Department is concerned about access to the information.
>
> I have reviewed NEB. REV. STAT. § 83-178(2) (Reissue 1994) and have decided to have you obtain the information and make it a separate attachment to your report. The

attachment will only be accessible to me, without written order of the court, after notice to the parties in this case and the Department. If a final decision is appealed, the attachment . . . is not to be released without authorization from the appellate court.

The letter indicates that a copy of this correspondence was also sent to Dunster, Gooch, and the prosecutor.

During the week of August 6, 1999, prior to the sentencing hearing, Dunster indicated to standby counsel that he would like the public defender's office reappointed as his attorney. On August 6, a hearing was held to consider Dunster's request. Dunster stated at this hearing that his former decision to proceed pro se and plead guilty had been impaired by the medications he was taking. The court reappointed the public defender's office to represent Dunster and continued any further proceedings until August 10.

On August 10, 1999, attorney Robert Hays from the public defender's office appeared on Dunster's behalf. Hays informed the court that he had been assigned to Dunster's case and had filed a motion on Dunster's behalf requesting a competency examination. This motion was granted, and on September 7, the competency hearing was held.

At the start of this hearing, Dunster made an oral motion to once again discharge the public defender's office. The court took the motion under advisement, pending the result of the competency hearing.

Dr. Y. Scott Moore, a psychiatrist, testified at the hearing. Moore testified that he had conducted a 2-hour interview with Dunster and had reviewed Dunster's medical records. Moore then testified that Dunster was "quite well oriented" and that "[h]e knows . . . what the charge is [and] the possibilities of consequences if he should go to trial." Moore further stated, "I found absolutely no spot in which Mr. Dunster is not in contact with reality. . . . Mr. Dunster . . . can come up with a defense if he wishes. I believe that he can confer with his attorney if he chooses to do so."

The court then asked Moore about the medications Dunster was taking. Moore testified that Dunster was taking Depakote "for smoothing a mood," Prozac "to help smooth mood in people who seem to be quite volatile," and Librium "to help Mr. Dunster

sleep in the evenings." Regarding these medications, Moore testified that he "saw absolutely no effect on [Dunster] of being able to interfere with his ability to answer questions or to deal with the realities of the moment." Moore also noted that Dunster was receiving a low dosage of these medications.

Hays did not ask Moore any questions.

At the conclusion of the evidence, the court determined that Dunster was competent. The court then considered Dunster's oral motion to proceed pro se, questioning Dunster about his reasons for wanting to discharge the public defender's office a second time. Dunster advised the court that he was dissatisfied with the public defender's office because it wanted him to withdraw his guilty plea and go to trial, while Dunster wanted to proceed to sentencing. Dunster also stated that he preferred being able to speak for himself, rather than having counsel speak on his behalf. After informing Dunster of his rights, the court found that Dunster's second waiver of counsel was made knowingly, intelligently, and voluntarily. The court then granted Dunster's second motion to discharge the public defender's office and reappointed that office as standby counsel. The court concluded the hearing, indicating that it would issue an order within 7 days setting the date for the sentencing hearing.

Previously, on July 16, 1999, the trial court entered an order setting the date for the sentencing hearing and determining that the sentence would be imposed by the trial court, without the use of a three-judge panel.

Dunster's sentencing hearing was conducted on November 22, 1999. Dunster appeared pro se, with Hays present as standby counsel. In accordance with Neb. Rev. Stat. § 29-2521 (Reissue 1995), the court first set out the general order of procedure for the sentencing hearing. The court explained that the State would first present its evidence of aggravating circumstances. Dunster then would have the opportunity to present any evidence regarding mitigating circumstances. In response, the State could present more evidence to rebut Dunster's evidence, and "we'll go back and forth until everybody is done."

The court then discussed the information it had received which it would consider for purposes of sentencing. The court stated it would consider Dunster's presentence investigation report

contained in three bound notebooks. The court informed the parties that the presentence investigation report included confidential mental health information from the Department of Correctional Services (DCS). The court noted that because access to this type of information is restricted, see Neb. Rev. Stat. § 83-178(2) (Reissue 1999), this mental health information would not be released to anyone unless a motion was made and a hearing held. The court also stated that it would consider exhibit 67, the report prepared by Moore regarding Dunster's competency.

The court concluded, "Now, that's my plan on how the sentencing phase should be conducted and the matters that will be considered. Do you have any comments or recommendations or suggestions . . . ? [Prosecutor]: No, Your Honor. THE COURT: Mr. Dunster? [Dunster]: No, Your Honor."

Before the State began presenting evidence, the court again urged Dunster to reconsider his decision to proceed pro se, stating:

> THE COURT: Mr. Dunster, I have previously advised you on numerous occasions, and I know you think, probably, too many, of your right to be represented by counsel. I'm aware that, at least in my opinion, you understand that right. I strongly urge you again, sir, at this time, to accept representation by the Public Defender's Office to represent you in this sentencing phase. Do you understand that?
>
> [Dunster]: Yes.
>
> [Q.]: Do you wish to have that done?
>
> [A.]: No.
>
> [Q.]: You still want to go on your own behalf?
>
> [A.]: Yes.

The State then presented evidence in support of the single aggravating circumstance asserted by the State, that "[t]he offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity." Neb. Rev. Stat. § 29-2523(1)(a) (Reissue 1995).

The evidence presented by the State showed that in 1972, in the State of Oregon, Dunster murdered Della Marie Brockamp, a 36-year-old mother of eight, while attempting to collect a debt from her husband. Brockamp died as the result of a single gunshot

wound to the head after she had been bound, gagged, and blind-folded. There were also indications that Brockamp had been sex-ually assaulted, although Dunster was charged only with murder. Dunster pled guilty and was sentenced to life imprisonment for his crime. The evidence also showed that in 1979, while housed at the Montana State Penitentiary, Dunster murdered inmate Milton Rozier. Rozier was found in his cell with his hands and feet bound, and a large gaping wound to his neck. Dunster even-tually confessed to murdering Rozier.

At the conclusion of the State's evidence, the court asked Dunster if he had any evidence to present.

[Dunster]: No.

THE COURT: Has Mr. Hays been available to you so that you could discuss that issue with him if you wanted to?

[A.] Yes.

[Q.] Are you sure you don't want to present any evi-dence with respect to mitigating circumstances?

[A.] The last letter I wrote to you was — spelled it out.

In that letter, dated September 14, 1999, and addressed to the trial court, Dunster wrote that he was looking forward to the sentencing hearing and saw the possibility of a death sentence as "my parole & pardon all in one."

The court then made the three bound notebooks of the pre-sentence report available for the prosecution and Dunster to look over. After this, the prosecution and Dunster made closing state-ments. Dunster told the court, "The position I'm in today is — I put myself there. I take full responsibility for it. . . . I'd rather just be executed than spend another day in prison."

The court issued its sentencing order on January 26, 2000. In the order, the court sentenced Dunster to death for the first degree murder of Witt and to not less than nor more than 20 years' imprisonment for use of a weapon to commit a felony. Regarding the imposition of the death penalty, the court found that the aggravating circumstance found in § 29-2523(1)(a) existed beyond a reasonable doubt in that Dunster had twice pre-viously been convicted of first degree murder.

In addition, the court found that the mitigating circumstance set out in § 29-2523(2)(g) existed in that Dunster suffers from antisocial personality disorder. Mitigating circumstance (2)(g)

exists when "[a]t the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication."

The court also discussed the mitigating circumstance set out at § 29-2523(2)(c), which exists when the "crime was committed while the offender was under the influence of extreme mental or emotional disturbance." The court noted that Dunster had been prescribed medication used to treat bipolar manic depressive conditions and that Dunster suffered from an ongoing "mental and/or emotional condition," which was being treated with medication at the time of Witt's murder. However, the court concluded that Dunster's mental condition did not constitute an " 'extreme' " disturbance and that therefore mitigating circumstance (2)(c) did not exist. The court further considered other nonstatutory mitigating factors including, but not limited to, "Dunster's general conduct during his numerous years of incarceration."

The court then determined that the weight of the mitigating circumstance and any nonstatutory mitigating factors did not approach or exceed the weight of the aggravating circumstance and that accordingly, imposition of the death penalty was appropriate and not disproportionate.

Dunster's appeal was automatically filed with this court, pursuant to § 29-2525, and the NCPA was appointed to represent Dunster on appeal. During the pendency of the appeal, Dunster wrote a letter to this court indicating that he no longer wanted to be executed.

After the appeal was docketed in the Supreme Court, but before oral argument, it was discovered that the confidential portion of the presentence report containing the mental health information from DCS was not included with the rest of the presentence report materials this court originally received from the district court on February 16, 2000. This court then requested that the district six probation office, which originally compiled the report, forward the omitted portion of the presentence report to this court. The confidential portion of the presentence report was received by this court on March 19, 2001. The parties were then notified that the complete presentence report was now on file in the office of the Clerk of the Supreme Court.

In response, Dunster filed a motion with this court. In the motion, Dunster objected to this court's actions in requesting the omitted portion of the presentence report. Dunster also requested, if the objection was overruled, that he be granted access to the confidential portion of the presentence report. The objection was overruled, and the parties were granted access to the confidential information. On April 6, 2001, the parties were ordered to submit supplemental briefs on "any and all related issues or questions which may be raised by the 'confidential attachment' or the Court's action in seeking its filing as part of the record in this appeal."

### III. ASSIGNMENTS OF ERROR

Dunster asserts, rephrased and renumbered, that the following errors occurred during the guilt phase of the proceedings: Dunster argues the trial court violated Dunster's constitutional rights in (1) failing to grant Dunster's June 8, 1999, request to disqualify the public defender's office, (2) failing to grant the public defender's July 13, 1999, request to withdraw and in failing to hold an evidentiary hearing prior to denying the July 13 request, (3) granting Dunster's request to proceed pro se during the guilt phase, (4) accepting Dunster's guilty pleas, and (5) improperly advising Dunster before accepting his pleas of guilty.

Dunster further contends the public defender's office violated Dunster's constitutional rights in (6) failing to ask a single question, raise a single objection, or make a single argument on Dunster's behalf during the competency hearing. Dunster alleges the trial court further violated his constitutional rights during the sentencing phase of the proceedings in (7) failing to appoint counsel to argue against the death penalty; (8) considering, in violation of *Gardner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), the confidential mental health information included in the presentence report; (9) imposing a death sentence where only aggravating circumstance (1)(a) was present; and (10) placing too much weight on aggravating circumstance (1)(a).

Regarding the presentence investigation report, Dunster asserts that (11) the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), in failing to disclose to Dunster the mitigating information contained in DCS records;

(12) the trial court failed to properly consider or discuss all of the mitigating evidence in its sentencing order; and (13) this court erred in directing the probation office to forward the omitted portion of the presentence report to the Clerk of the Supreme Court.

For the sake of completeness, we note that in various assignments of error, Dunster asserts possible violations of the Eighth Amendment. However, because Dunster fails to argue any such violations in his brief, we do not address the Eighth Amendment. Errors that are assigned but not argued will not be addressed by an appellate court. *State v. Caddy, ante* p. 38, 628 N.W.2d 251 (2001).

## IV. STANDARD OF REVIEW

■ When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. Schnabel,* 260 Neb. 618, 618 N.W.2d 699 (2000); *State v. Hansen,* 259 Neb. 764, 612 N.W.2d 477 (2000).

■ Although an appellate court will not address an ineffective assistance of counsel claim on direct appeal when the matter necessitates an evidentiary hearing, such claims do not "require dismissal ipso facto." *State v. Bennett,* 256 Neb. 747, 751, 591 N.W.2d 779, 782 (1999). The determining factor is whether the record is sufficient to adequately review the question presented. *Id.*

■ Under *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in order to show ineffective assistance of counsel such that a conviction must be overturned, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Narcisse,* 260 Neb. 55, 615 N.W.2d 110 (2000). A conflict of interest must be actual rather than speculative or hypothetical before a conviction can be overturned on the ground of ineffective assistance of counsel. *Id.*

■ In reviewing a sentence of death on appeal, this court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty. *State v. Bjorklund,* 258 Neb. 432, 604 N.W.2d 169 (2000). See, also, Neb. Rev. Stat. § 29-2522 (Reissue

1995). This court must also determine whether the imposition of the death penalty is excessive or disproportionate to the penalty imposed in similar cases. *Id.*

## V. ANALYSIS

### 1. DISQUALIFICATION OF PUBLIC DEFENDER'S OFFICE

(a) June 8, 1999, Letter Regarding Conflict of Interest

Dunster first argues that his Sixth Amendment right to effective assistance of counsel was violated when the trial court failed to grant Dunster's June 8, 1999, request to disqualify the public defender's office due to an alleged conflict of interest. Although an appellate court will not address an ineffective assistance of counsel claim on direct appeal when the matter necessitates an evidentiary hearing, such claims do not "require dismissal ipso facto." *State v. Bennett*, 256 Neb. 747, 751, 591 N.W.2d 779 (1999). The determining factor is whether the record on appeal is sufficient to adequately review the question presented. *Id.* We conclude that the record is sufficient to adequately review this issue.

The record shows that on July 2, 1999, Dunster withdrew his June 8 request to disqualify the public defender's office without prejudice. On July 13, when Dunster requested to proceed pro se, the court specifically asked Dunster again about the conflict of interest issues raised in his June 8 letter. Dunster responded that his June 8 letter had been withdrawn and that the only issues now before the court were his motion to proceed pro se and his motion to plead guilty. Because the record clearly shows that Dunster withdrew the June 8 letter from the court's consideration, the court could not have erred in failing to grant Dunster's June 8 request to disqualify the public defender's office. Dunster cannot assert that the trial court erred in refusing to grant the June 8 request for disqualification when it was Dunster's decision to withdraw that issue from the trial court's consideration. A defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit. *State v. Trackwell*, 250 Neb. 46, 547 N.W.2d 471 (1996).

(b) June 17, 1999, Conflict of Interest

Dunster next argues that the public defender's office should have been disqualified in any event because the hearing on June

17, 1999, itself created a conflict of interest in that "the public defender [Keefe] appeared and gave evidence against Mr. Dunster." Brief for appellant at 30. Dunster asserts that "Mr. Keefe's position was contrary to that of Mr. Dunster . . . ." Brief for appellant at 32. Dunster contends the trial court's failure to disqualify the public defender's office, based on what occurred at the June 17 hearing, violated Dunster's constitutional right to effective assistance of counsel. Again, we determine that the record is sufficient to adequately address this issue.

Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in order to show ineffective assistance of counsel such that a defendant's conviction must be overturned, the defendant must show that his counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. See *State v. Narcisse*, 260 Neb. 55, 615 N.W.2d 110 (2000). The right to effective assistance of counsel generally requires that the defendant's attorney be free from any conflict of interest. U.S. Const. amend. VI; Neb. Const. art. I, § 11; *Narcisse, supra*. The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard for another or where a lawyer's representation of one client is rendered less effective by reason of his representation of another client. *Narcisse, supra*. A conflict of interest must be actual rather than speculative or hypothetical before a conviction can be overturned on the ground of ineffective assistance of counsel. *Id*. See, also, *State v. Turner*, 218 Neb. 125, 354 N.W.2d 617 (1984). The defendant who shows that a conflict of interest actually affected the adequacy of his or her representation need not demonstrate prejudice, but such conflict of interest must be shown to have resulted in conduct by counsel that was detrimental to the defense. *Narcisse, supra*.

The threshold question presented by Dunster's assertions regarding Keefe's testimony is whether an actual conflict of interest was created at the June 17, 1999, hearing. We find the record does not show that Keefe's testimony created any conflict of interest. Keefe testified about the policy in the public defender's office regarding confidentiality. This is not testimony "against" Dunster, but simply information about the internal policies of the public defender's office. Both the public defender's office and Dunster

share the same interest, that is, to provide Dunster with legal representation free from any conflicts of interest.

While Dunster distrusted the assertion that no information had been or would be exchanged between Gehr and his mother, this distrust does not create a conflict of interest within the public defender's office. See *State v. Bjorklund*, 258 Neb. 432, 450, 604 N.W.2d 169, 194 (2000) ("mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel"). Additionally, the record was sufficient for the trial court to conclude that no conflict of interest actually existed and that Dunster's distrust was unfounded. This assignment of error is without merit.

### 2. July 13, 1999, Motion to Withdraw

In his second assignment of error, Dunster argues that the trial court erred in failing to grant Gooch's July 13, 1999, request to withdraw and in failing to hold an evidentiary hearing prior to denying the request. Dunster contends the trial court's actions deprived him of his Sixth Amendment right to effective assistance of counsel.

■ We first determine that the court did not err in failing to hold an evidentiary hearing. We stated in *State v. Marchese*, 245 Neb. 975, 980, 515 N.W.2d 670, 674 (1994), that "a hearing must take place when the requisite ' " 'special circumstances' " ' putting the trial court on notice of a possible conflict of interest arise." See, also, *State v. Hudson and Maeberry*, 208 Neb. 649, 305 N.W.2d 359 (1981). However, in the present case, there are no special circumstances putting the trial court on notice of a possible conflict of interest. Gooch was not a witness against Dunster. The hypothetical possibility that Gooch might be called to testify in some future proceeding against Dunster was simply speculation on Gooch's part. The court did not err in failing to conduct an evidentiary hearing on the request to withdraw.

Dunster however asserts that the trial court's denial of Gooch's motion to withdraw deprived him of his Sixth Amendment right to effective assistance of counsel because allowing Gooch to continue as Dunster's attorney placed Gooch "in the position of being an advocate for Mr. Dunster, while at the same time being a witness before a court or jury." Brief for

appellant at 35. These asserted dual positions, Dunster argues, created an unacceptable conflict of interest.

As previously noted, in order to overturn a conviction or sentence based on ineffective assistance of counsel due to a conflict of interest, the asserted conflict of interest must be actual, rather than speculative or hypothetical. *State v. Narcisse*, 260 Neb. 55, 615 N.W.2d 110 (2000). The standard for prevailing on an ineffective assistance of counsel claim is the same whether such claim is raised on direct appeal or in a postconviction proceeding. *Narcisse, supra*; *State v. Turner*, 218 Neb. 125, 354 N.W.2d 617 (1984).

The record shows that there was no conflict of interest at the time Gooch requested permission to withdraw. Gooch's assertion that he might be called as a witness was purely speculative and hypothetical. There were no pending charges against Dunster regarding the incident. Dunster's second assignment of error is without merit.

### 3. DUNSTER'S REQUEST TO PROCEED PRO SE DURING GUILT PHASE

In his third assignment of error, Dunster asserts that the trial court erred in granting his July 13, 1999, motion to discharge his counsel and proceed pro se.

A defendant may waive the constitutional right to counsel, so long as the waiver is made knowingly, voluntarily, and intelligently. See, *State v. Paul*, 256 Neb. 669, 592 N.W.2d 148 (1999); *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997). See, also, generally, *Bousley v. United States*, 523 U.S. 614, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); *Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970). In *State v. Wilson*, 252 Neb. at 649-50, 564 N.W.2d at 251, we set forth the standard for determining when a defendant's waiver of counsel is effective, stating:

> In order to exercise the right of self-representation, a defendant must first make a knowing and intelligent waiver of the right to counsel. . . .
>
> In determining whether there has been a knowing and voluntary waiver of the right to counsel, the key inquiry is whether the defendant was sufficiently aware of the right

to have counsel and of the possible consequences of a decision to forgo the aid of counsel. . . . A knowing and intelligent waiver can be inferred from conduct. Consideration may also be given to a defendant's familiarity with the criminal justice system. . . . At a minimum, the determination of whether a waiver is knowing and intelligent requires that the accused be made sufficiently aware of the right to have counsel present and of the possible consequences of a decision to forgo the aid of counsel. . . . We have held that a "trial court should warn a defendant who has the right to counsel of the dangers and disadvantages of self-representation, but that the warning is not required."

(Citations omitted.) See, also, *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 63 S. Ct. 236, 87 L. Ed. 268 (1942).

Before granting Dunster's request to discharge the public defender's office, the court determined that Dunster was competent and advised Dunster of the nature of the charges against him and the possible penalties, including the possible imposition of the death penalty. The trial court also questioned and advised Dunster on various issues as follows:

THE COURT: Okay. Sir, as I am aware in this case, the public defender is court appointed to represent you. You need to understand that if I accept your discharge or your request to discharge the public defender, I will in all likelihood not appoint another attorney to represent you and you would be required to represent yourself, do you understand that?

[Dunster]: Yes.

. . . .

[Q.] Okay. And do you understand that as a lay person, and I'm not saying anything bad about lay persons or people, but we in the legal field have these little rules that we do that are — they don't compare to anything else in daily life.

[A.] Exactly.

[Q.] And that you would not have that expertise, do you understand that?

[A.] Exactly.

[Q.] And you understand that would be a concern —
[A.] Well —
[Q.] — potentially —
[A.] For you.
[Q.] — of you representing yourself, the State could object to something and you wouldn't be able to figure out how to get around it, but if you had an attorney, he or she would figure out — would be able to figure out what needed to be done to meet the concern.
[A.] Doesn't — It doesn't matter.
[Q.] But you understand that?
[A.] I understand it.

. . . .

[Q.] [I]f I allow you to discharge the public defender, you will not be entitled to special privileges, such as additional access to legal materials and/or facilities, solely because you're representing yourself, do you understand that?
[A.] Yes.

. . . .

[Q.] Mr. Dunster, I want you to understand I think you're making a terrible mistake in electing to represent yourself. There's an old adage that a person who represents himself has a fool for an attorney and a fool for a client. This has nothing to do with your mental capacity or anything like that, but rather addresses the complexity of representing a client in a case.

Not only does representation require knowledge of the law and of procedures, it requires an emotional detachment that at times is difficult to achieve even — excuse me — if you're acting as you're [sic] own attorney. In fact, even attorneys in cases sometimes have trouble with the emotional detachment that's required, do you understand that?
[A.] Yes.

. . . .

[Q.] Okay. You've had attorneys to discuss self representation with, two different attorneys?
[A.] Yeah.

. . . .

[Q.] Do you waive, do away with and give up your right to be represented by counsel in this case?

[A.] Yes.

. . . .

[Q.] Has anyone made any threats — any threat, in any manner whatsoever, or used any force or held out any inducement or promise to get you to give up your right to be represented by counsel?

[A.] No.

[Q.] Are you giving up this right freely and voluntarily?

[A.] Yes.

. . . .

[Q.] And you understand that I believe, I strongly believe, that this is an error on your part?

[A.] Exactly, but it's my life.

The record shows that Dunster had previously been advised of his right to counsel and in fact had been so represented by the public defender's office to this point in the proceedings. The record shows that Dunster's waiver of counsel was made knowingly.

The record also shows that Dunster's waiver was made intelligently. The trial court painstakingly explained the trial process and how that process could be impacted if Dunster waived his right to counsel. The court further explained that Dunster's lack of legal knowledge could affect his ability to effectively represent himself and that Dunster could be sentenced to death for his crimes if found guilty. Dunster was also given the opportunity to discuss his decision to proceed pro se with both the public defender's office and with the NCPA.

The record further shows that Dunster's waiver was made voluntarily. No promises or threats were made to encourage Dunster to forgo his right to counsel. Dunster prepared and offered his own written motion to the court to discharge counsel and admitted that he was doing this on his own accord, over the advice of counsel, because "I just want to just get it over with."

Dunster now asserts on appeal, however, that his request to discharge counsel during the guilt phase was not voluntary because his "request to proceed *pro se* was forced on him by the conduct of the public defender" in violation of Dunster's right to effective counsel. Brief for appellant at 38.

"When a defendant becomes dissatisfied with court-appointed counsel, unless the defendant can show good cause to the court for the removal of counsel, his or her only alternative is to proceed pro se if competent to do so." *State v. Bjorklund*, 258 Neb. 432, 450, 604 N.W.2d 169, 194 (2000), citing *State v. McPhail*, 228 Neb. 117, 421 N.W.2d 443 (1988). "The right of an indigent defendant to have counsel does not give the defendant the right to be represented by counsel of his or her own choosing, and mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel." *Id.* Furthermore, as we stated in *State v. Wilson*, 252 Neb. 637, 651, 564 N.W.2d 241, 252 (1997): "A defendant may not use 'his or her right to counsel to manipulate or obstruct the orderly procedure in the court or to interfere with the fair administration of justice.'" Quoting *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991). Accord *State v. Denbeck*, 219 Neb. 672, 365 N.W.2d 469 (1985).

Dunster relies on *Gilbert v. Lockhart*, 930 F.2d 1356 (8th Cir. 1991), to support his assertion that he was "forced" to proceed pro se. In *Gilbert*, the defendant was given the choice of proceeding to trial with unprepared counsel or pro se. However, this record reveals a quite different explanation for Dunster's request to discharge counsel.

Before granting Dunster's request to discharge the public defender's office, the court further questioned Dunster:

THE COURT: Why do you wish to discharge the Public Defender's Office?

[Dunster]: I'm not satisfied with them.

[Q.] Okay. So it's dissatisfaction with this service with which you've been provided, is that it?

[A.] Yes.

. . . .

[Q.] . . . What is your dissatisfaction with the Public Defender's Office, that you wish to have it discharged?

[A.] I just want to get it over with.

[Q.] They weren't doing what you wanted?

[A.] Basically. I'm guilty.

[Q.] And you were dissatisfied that they were not getting the goal that you wanted to get, is that it?

[A.] True.

[Q.] It's not that you thought they were incompetent and you wanted to have other attorneys represent you or anything like that? It's just that you had a goal, they weren't getting you to where you wanted to get, and you wanted to do it yourself?

[A.] Like I said, your electric chair doesn't scare me. I'm ready to go. Are you ready to pull the switch? That's the bottom line.

[Q.] Okay.

[A.] If they want to pussy foot around over here and drag their feet, that's on them. I'm ready to go. Let's do it.

. . . .

[Q.] . . . So now I understand what your dissatisfaction was. It was that you weren't getting — you wanted to get this behind you and plead guilty and that's it, and that wasn't getting done with the PD's Office, right?

[A.] No.

[Q.] Is that correct?

[A.] That's true.

The record shows that Dunster was dissatisfied with the public defender's office because Dunster was impatient with the process and thought that counsel from the public defender's office were "drag[ging] their feet." Dunster believed that dismissing counsel and proceeding pro se would expedite the proceedings against him. Dunster voluntarily chose to exercise his constitutional right to proceed pro se during the guilt phase of his trial, based on his own statements, because he wanted "to get it over with."

A defendant has the right under U.S. Const. amend. VI and XIV, and Neb. Const. art. I, § 11, to be represented by an attorney in all critical stages of a criminal prosecution. However, this same constitutional right also guarantees the right of a defendant to represent himself or herself. *State v. Green, supra.* See, also, *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). The record clearly shows that Dunster's decision to discharge the public defender's office and proceed pro se was not involuntary or "forced" upon him.

Finally, Dunster asserts that his request to proceed pro se was constitutionally flawed because his mental health was impaired

by the medications he was taking. However, this claim is refuted by Moore's testimony as set forth elsewhere in this opinion that Dunster's three medications had "no effect" on Dunster's competency. Consistent with Moore's testimony, Dunster stated during the hearing in response to the court's questions:

THE COURT: Does the medication affect your ability to understand what's going on around you?

[Dunster]: No.

[Q.] Does it make you groggy or anything like that?

[A.] No.

[Q.] What effect does it have on you?

[A.] None.

[Q.] None?

[A.] None.

. . . .

[Q.] Do they affect your ability to understand what's going on around you?

[A.] No.

. . . .

[Q.] . . . Have you been diagnosed as suffering from any mental disorder?

[A.] Bipo- —

[Q.] Bipolar?

[A.] Yeah.

. . . .

[Q.] . . . This bipolar disorder from which you suffer, and the medication, has that affected your ability to interact with your attorneys that have represented you up until today?

[A.] No.

[Q.] Has it affected your ability to understand what they've been telling you?

[A.] No.

. . . .

[Q.] . . . Does it affect your ability to understand what's going on here today?

[A.] It has no effect at all.

The record shows that Dunster was competent and his request to discharge counsel was made knowingly, intelligently, and voluntarily. The trial court did not err in granting Dunster's July

13, 1999, request to discharge the public defender's office and proceed pro se. This assignment of error is without merit.

### 4. ACCEPTING GUILTY PLEAS

In his fourth assignment of error, Dunster argues that the court erred in accepting his pleas of guilty because Dunster stated during the proceedings that he was pleading guilty because he wanted to be executed.

Before accepting a guilty plea, the court must find that the plea of guilty has been entered freely, intelligently, voluntarily, and understandingly by the defendant. This requires the court to inform a defendant concerning (1) the nature of the charge, (2) the right to assistance of counsel, (3) the right to confront witnesses against the defendant, (4) the right to a jury trial, and (5) the privilege against self-incrimination. The record must also establish a factual basis for the plea and that the defendant knew the range of penalties for the crime charged. *State v. Paul*, 256 Neb. 669, 592 N.W.2d 148 (1999), citing *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986); *State v. Tweedy*, 209 Neb. 649, 309 N.W.2d 94 (1981). See, also, *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969) (Fifth Amendment requires record affirmatively show guilty plea was knowing, intelligent, and voluntary).

Dunster argues that even though the requirements under *Irish, supra*, and *Boykin, supra*, have been met, a guilty plea cannot be accepted if the defendant expresses a desire to be executed. This contention has been rejected by a number of courts. See, e.g., *Gilmore v. Utah*, 429 U.S. 1012, 97 S. Ct. 436, 50 L. Ed. 2d 632 (1976), *rehearing denied* 429 U.S. 1030, 97 S. Ct. 655, 50 L. Ed. 2d 636; *Colwell v. State*, 273 Ga. 634, 639-40, 544 S.E.2d 120, 127 (2001) (stating defendant was "sentenced to death because of the nature of his crimes, not because of his own desire to die"); *People v. Bloom*, 48 Cal. 3d 1194, 774 P.2d 698, 259 Cal. Rptr. 669 (1989). We determine that Dunster's expressed preference for a particular punishment did not render his guilty pleas constitutionally flawed. A defendant cannot "choose" the death penalty. Under our statutory system, the sentencing decision rests with the court alone. See, Neb. Rev. Stat. § 29-2520 (Reissue 1995); § 29-2522.

Dunster further asserts that his guilty pleas were constitutionally flawed because his mental health was impaired by the medications he was taking. As discussed previously, the record does not support Dunster's contention. Dunster's fourth assignment of error is without merit.

### 5. COURT'S ADVICE

Dunster asserts in his fifth assignment of error that his guilty pleas are invalid because the court provided Dunster with erroneous advice before accepting his guilty pleas. Dunster contends that the court incorrectly advised him that by entering his pleas of guilty, he was giving up any opportunity at sentencing or on appeal to argue that the death penalty in Nebraska is unconstitutional or to have the court determine whether Dunster's statements to officials were freely, voluntarily, knowingly, and intelligently made. In effect, Dunster asserts that the trial court instructed him that his guilty pleas would have a more onerous result than was true under the law. Dunster argues that this invalidates his guilty pleas because the pleas were based on erroneous advice from the court. See *State v. Paul, supra.*

Prior to accepting Dunster's guilty pleas, the court explained that the guilt phase and the sentencing phase were two distinct parts of the trial and that Dunster's pleas addressed only the guilt phase of the proceedings. The court stated:

> THE COURT: Sir, do you understand that due to the fact that this is a death penalty case, that if, in fact, you are found guilty of first degree murder, there is then what's called a bifurcated, that is a separate hearing, that relates to the issue of whether the death penalty should or should not be imposed in this case, do you understand that?
>
> [Dunster]: Yes.
>
> . . . .
>
> [Dunster]: Can I waive a presentence investigation and be sentenced today?
>
> THE COURT: No. . . .
>
> . . . .
>
> [Dunster]: . . . I want to waive presentence.
>
> THE COURT: I understand that, but there's more to it in this type of a case than just getting the completion of a

presentence investigation. There's also the sentencing phase in this type of a case. . . .

. . . .

THE COURT: Okay. Since the State will be seeking the death penalty in this case, sir, if I do accept your plea and I find you guilty of first degree murder, a Class 1 or 1A felony, then I am required by statute within seven days from today's date to set the matter down for a penalty phase hearing.

The court then advised Dunster that by pleading guilty, he would be giving up his right to the presumption of innocence, his right to a trial to determine his guilt, and his right to confront his accusers at trial. The court also informed Dunster of the possible penalties if he were found guilty of the charges against him. The court then discussed the 33 pretrial motions filed by Gooch on Dunster's behalf:

THE COURT: . . . I just want to go down the [pretrial] motions that are actually filed in this case. Mr. Gooch filed, as I mentioned, I think, yesterday, 33 motions in this case. Some of these [motions] involve whether in fact the death penalty provisions in the state of Nebraska are unconstitutional. Do you understand that?

[Dunster]: Yes.

[Q.] Do you understand that by entering a plea of guilty in this case, you are giving up your right to make these challenges?

[A.] Yes.

. . . .

[Q.] Mr. Gooch has also filed [motions] requesting that any statements you made be suppressed. Do you understand that?

[A.] Yes.

[Q.] Sir, if I accept your plea and find you guilty, you are giving up your right to have me make a determination as to whether those statements were freely, voluntarily, knowingly and intelligently made. Do you understand that?

[A.] Yes.

[Q.] Sir, do you understand that if I found that any one of those items was missing, any such statement, admission or confession could not be used against you at the time of trial?

[A.] Yes.

The court also explained to Dunster: "Mr. Gooch has also made challenges with respect to the sentencing phase of any — of this case, and do you understand that unless you renew them yourself, that you're giving up your right to have those matters pursued also? Do you understand that? [A.] Yes."

Dunster's assertion that the court provided him with erroneous advice is not supported by the record. The two statements by the trial court which Dunster contends were erroneous occurred during the above-quoted discussion regarding the 33 motions. We find that the record shows the court correctly advised Dunster that by pleading guilty, Dunster was waiving any issues raised in the 33 motions which might have had an impact on the determination of Dunster's guilt. A valid guilty plea waives all defenses to a criminal charge. *State v. Silvers*, 255 Neb. 702, 587 N.W.2d 325 (1998). The court further advised Dunster that any issues in the 33 motions related to the sentencing phase of the proceedings, which would include any challenge to the constitutionality of Nebraska's death penalty statutes, would also be waived unless Dunster renewed the motions himself. Dunster's assertion that the trial court advised him that by pleading guilty, Dunster would forever waive the issues raised in the 33 motions related to sentencing, is not supported by the record. The trial court specifically advised Dunster that he could renew any challenges related to sentencing raised in the 33 motions. This assignment of error is without merit.

### 6. COMPETENCY HEARING

In his sixth assignment of error, Dunster asserts that he received ineffective assistance of counsel during the competency hearing on September 7, 1999, when he was represented by the public defender's office. As with Dunster's other ineffective assistance of counsel claims, we determine the record sufficient to adequately address this assignment of error.

Dunster contends that Hays' performance was deficient during the hearing in that counsel "did not ask a single question, present any evidence, make any objections, or present any argument regarding his client's competency to enter a guilty plea." Brief for appellant at 39. Dunster also asserts that Hays failed to

develop "the necessary evidence regarding competency," *id.* at 41, and that the advocacy provided to Dunster was "absolutely zero," *id.* at 39.

Dunster asserts that he was prejudiced by Hays' inaction because there were "no questions . . . concerning the synergistic effects," *id.*, or possible " 'paradoxical' side effects" of Dunster's three medications, Depakote, Prozac, and Librium, when taken in combination, supplemental brief for appellant at 28.

As noted previously, to prevail on a claim of ineffective assistance of counsel, the defendant must show that his counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Marshall,* 253 Neb. 676, 573 N.W.2d 406 (1998). That is, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. The two prongs of the test stated in *Strickland, supra,* may be addressed in either order. If it is appropriate to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *Id.*

While Dunster asserts that there was no discussion of the synergistic effects of his medications during the competency hearing, the record shows that Moore was questioned on this specific issue by the court:

> [Court:] What happens when a person takes all three of these at a time? I mean, what effect does it have on an individual?

> [Moore:] Well, mostly, none. On occasion, someone might say it might make them slightly drowsy.

> Q Does it have an ability to interfere with their ability to understand what's going on around them?

> A It could in some people on an individual basis. I found no evidence that it was affecting Mr. Dunster in that fashion.

> . . . .

> Q Did you believe that those medications, presuming he was taking them regularly, were in any way affecting his ability to understand what was going on in the session you had with him?

A Absolutely not. That was one of the things I was particularly looking at. In fact, the doses are all quite low.

. . . .

[N]ot only are they low doses, but I saw absolutely no effect on him of being able to interfere with his ability to answer questions or to deal with the realities of the moment.

The fact that Hays chose not to question Moore about the combined effect of the three medications resulted in no prejudice to Dunster because Moore was questioned on that issue by the court. Moore stated that the combined medications had no effect on Dunster's ability to answer questions or deal with the realities of the moment. Dunster has failed to assert or demonstrate any reasonable probability that the outcome of the competency hearing would have been different if Hays had questioned Moore about the combined effect of the three medications. See *Marshall, supra.* This assignment of error is without merit.

## 7. APPOINTING AMICUS COUNSEL

In his seventh assignment of error, Dunster contends the trial court erred in failing to appoint amicus counsel to advocate against the imposition of the death penalty. Although Dunster chose not to present any mitigating evidence at the sentencing hearing, he now contends on appeal that amicus counsel should have been appointed in any event to present such evidence and "argue for life." Brief for appellant at 54.

" 'A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense . . . .' " *State v. Wilson*, 252 Neb. 637, 649, 564 N.W.2d 241, 251 (1997), quoting *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). Dunster in effect urges this court to override a defendant's constitutional right to control the organization and content of his or her own defense during sentencing. We decline to do so.

Dunster elected not to present any mitigating evidence at the sentencing hearing. A defendant may lawfully waive his or her right to present mitigating evidence during sentencing. See, e.g., *Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999); *Brecheen*

*v. Reynolds,* 41 F.3d 1343 (10th Cir. 1994); *Snell v. Lockhart,* 14 F.3d 1289 (8th Cir. 1994); *Singleton v. Lockhart,* 962 F.2d 1315 (8th Cir. 1992); *Silagy v. Peters,* 905 F.2d 986 (7th Cir. 1990). Dunster's assertion that the trial court erred in failing to appoint amicus counsel is without merit.

### 8. PRESENTENCE INVESTIGATION REPORT

In his eighth assignment of error, Dunster asserts that the sentencing court committed error under *Gardner v. Florida,* 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), in considering a confidential portion of Dunster's presentence investigation report for purposes of sentencing.

On July 28, 1999, the sentencing court wrote a letter to the probation officer preparing Dunster's presentence report, instructing the officer to include information in the possession of DCS "for inclusion as part of the presentence investigation report." Copies of this letter were sent to Dunster, standby counsel, and the prosecution. The court noted in the letter that access to this information was restricted by § 83-178(2) and that the information would not be released to anyone other than the court, except upon "written order." Section 83-178(2) states that "[t]he content of the [inmate's] file shall be confidential and shall not be subject to public inspection except by court order for good cause shown and shall not be accessible to any person committed to the department."

At the August 6, 1999, hearing reappointing the public defender's office, the court discussed this confidential information, referring to the July 28 letter. The court noted that Dunster had received a copy of the letter, which dealt with "some issues with respect to the PSI and matters that are in the possession of the Department of Correctional Services."

At the sentencing hearing on November 22, 1999, the court made the presentence investigation report available to Dunster, standby counsel, and the prosecution. The court stated:

> I also have received a confidential part of the presentence investigation which relates to mental health information. That will not be disclosed to anyone, unless somebody makes a motion, so that there's an ample opportunity for hearing by the Department of Correctional Services

with respect to that. That's under — there's a statute relating to release of confidential information to a person who is incarcerated. I will consider that information also.

Dunster argues that the court committed reversible error under *Gardner, supra,* in considering the confidential mental health information provided by DCS.

In *Gardner*, 430 U.S. at 362, the U.S. Supreme Court held that the Due Process Clause does not allow a sentence of death to be imposed on the basis of information which the defendant had "no opportunity to deny or explain." In *Gardner*, the defendant was convicted of first degree murder. During the jury's sentencing deliberations, the court ordered a presentence investigation report on the defendant. The jury, without seeing the report, found that the mitigating circumstances outweighed aggravating circumstances and recommended a life sentence.

The trial court then received the presentence report. The trial court made a portion of the presentence report available to defense counsel, but did not disclose to counsel the existence or contents of a confidential portion of the presentence report. A few weeks later, the trial court issued its order. The court found that no mitigating circumstances existed and sentenced the defendant to death. On appeal to the state supreme court, the confidential portion of the presentence report was not included in the record. Nevertheless, the trial court's imposition of the death penalty was affirmed.

The defendant then appealed to the U.S. Supreme Court. The Supreme Court determined that given the trial court's conclusion that death was the appropriate penalty, and not life in prison as recommended by the jury, the information contained in the presentence report contributed to the imposition of the death penalty. As such, the defendant's right to due process was violated because he was sentenced, at least in part, on the basis of confidential information which he had no opportunity to deny or explain. The Court went on to note that "if it were permissible to withhold a portion of the report from a defendant, and even from defense counsel, pursuant to an express finding of good cause for nondisclosure, it would nevertheless be necessary to make the full report a part of the record to be reviewed on appeal." *Gardner v. Florida*, 430 U.S. 349, 360-61, 97 S. Ct.

1197, 51 L. Ed. 2d 393 (1977). The defendant's death sentence was reversed, and the cause was remanded.

In the context of criminal proceedings, due process generally requires the defendant be given notice and an adequate opportunity to defend himself or herself. *Gray v. Netherland,* 518 U.S. 152, 181, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996) (" '[c]ommon justice requires that no man shall be condemned in his person or property without . . . an opportunity to make his defence.' *Baldwin v. Hale,* 1 Wall. 223, 233 (1864)"). See, also, *State v. Schaeffer,* 218 Neb. 786, 359 N.W.2d 106 (1984).

However, unlike the defendant in *Gardner, supra,* Dunster had notice and ample opportunity to obtain access to the confidential information. The July 28, 1999, letter notified Dunster that information from DCS would be included in his presentence report and that access to this information was limited. The court reminded Dunster of these facts at the hearing on August 6. Dunster was notified a third time at the sentencing hearing. Dunster was aware of the existence of the confidential information and the type of confidential information (mental health information) prior to being sentenced.

The court specifically informed Dunster at the sentencing hearing that it would consider the confidential information for purposes of sentencing. The court also noted at the sentencing hearing that this information was confidential, but that Dunster could seek access to the confidential information, by "mak[ing] a motion." The court further explained that if such a motion was filed, the court would hold a hearing on the matter. After explaining this at the sentencing hearing, the court asked Dunster if he had any comments, recommendations, or suggestions on "how the sentencing phase should be conducted." Dunster responded, "No, Your Honor."

The record shows that Dunster was given notice well in advance of the sentencing hearing that confidential DCS information would be included in the presentence report. It is also clear from the record that Dunster understood how to exercise his opportunity to obtain the confidential information by making a motion. Dunster had drafted and presented motions to the court previously when he requested to proceed pro se and when he changed his pleas to guilty. However, from July 1999 until

January 26, 2000, when the court issued its sentencing order, Dunster did not request access to this confidential information. Instead, Dunster consistently indicated that he did not want a presentence report prepared, nor did he desire to present any mitigating evidence at sentencing.

Dunster's case does not present the due process concerns of *Gardner, supra.* The record clearly shows that Dunster had the opportunity to "deny or explain," see *Gardner,* 430 U.S. at 362, the mental health information provided by DCS, and simply chose not to avail himself of the opportunity.

In *Gardner, supra,* there was also the separate concern that the confidential information was not a part of the record on appeal, thus precluding meaningful appellate review. Here, the full presentence investigation report, including the confidential portion, has been reviewed by this court.

We determine that Dunster's eighth assignment of error is without merit. Dunster's due process rights have not been violated by the sentencing court's consideration of the confidential portion of the presentence report.

### 9. SENTENCE IMPOSED

Dunster argues in his next two assignments of error that the trial court erred in imposing a death sentence where only one aggravating circumstance was present and in placing too much weight on that aggravating circumstance.

Dunster does not dispute that the existence of aggravating circumstance (1)(a), "[t]he offender was previously convicted of another murder," was proved beyond a reasonable doubt at sentencing. See § 29-2523(1)(a). Dunster instead argues that more than one aggravating circumstance is required for the death penalty to be imposed. First, Dunster argues that because the term "aggravating circumstances" is stated in the plural in § 29-2523, the court is required to find at least two aggravating circumstances before imposing a death penalty. This argument is without merit. In construing Chapter 29, "[t]he singular number includes the plural and the plural the singular." Neb. Rev. Stat. § 29-101 (Reissue 1995).

Second, Dunster argues that no one has been sentenced to death in Nebraska where only one aggravating circumstance

was present. However, the balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting, but, rather, requires a careful weighing and examination of the various factors. See, *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989); *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986). As we stated in *State v. Stewart*, 197 Neb. 497, 518, 250 N.W.2d 849, 862 (1977), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986):

> "It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present."

We determine that where the record reveals that the sentence of death was the result of reasoned judgment and the careful weighing and examination of the various circumstances and factors in light of the totality of the circumstances present, one aggravating circumstance may be sufficient under our statutory system for the sentencing court to conclude that imposition of the death penalty is appropriate. This assignment of error is without merit.

Dunster further asserts that the sentencing court erred by placing too much weight on aggravating circumstance (1)(a). In reviewing a sentence of death on appeal, this court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances support the imposition of the death penalty. This court must also determine whether the imposition of the death penalty is excessive or disproportionate to the penalty imposed in similar cases. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). See, also, § 29-2522.

After de novo review, we conclude that the requirements of Neb. Rev. Stat. §§ 29-2519 to 29-2546 (Reissue 1995 & Cum. Supp. 1996) have been met. The record shows that aggravating circumstance § 29-2523(1)(a), which was proved beyond a reasonable doubt, is sufficient to "justify the imposition of death." The record indicates that in 1972, Dunster murdered Brockamp with a single gunshot wound to the head after he had bound,

gagged, and blindfolded her. In 1979, Dunster bound and murdered inmate Rozier. Based upon our de novo review of the record, we determine that these two previous murders, which were proved beyond a reasonable doubt at the sentencing hearing, are sufficient under aggravating circumstance (1)(a) to justify imposition of the death penalty.

We next turn to consideration of the mitigating circumstances. We find that the evidence supports the existence of mitigating circumstance (2)(g). The record shows that at the time of the crime, Dunster's capacity "to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness [or] mental defect." We have also considered all evidence of nonstatutory mitigating factors. However, based upon our de novo review of the record, we determine that the statutory and nonstatutory mitigating circumstances together do not approach or exceed the aggravating circumstance in this case.

Finally, we turn to the proportionality review required under §§ 29-2522 and 29-2521.03. We recognize that the application of § 29-2521.03 has been criticized by some members of this court, see *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998) (Connolly, J., concurring; Gerrard, J., concurring, joined by Stephan, J.), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999), however, we need not revisit that issue in this case. Regardless of what kind of proportionality review is conducted, we conclude that Dunster would still be eligible for the death penalty. See *Bjorklund, supra*.

We determine that Dunster's death sentence was not excessive or disproportionate.

### 10. *BRADY* VIOLATION

In his next assignment of error, Dunster argues that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Dunster asserts that a *Brady* violation occurred in that the prosecution failed to disclose "mitigating evidence contained in the

Department of Correctional Services records." Supplemental brief for appellant at 33.

As support for his assertion, Dunster relies on *U.S. v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992). In *Spagnoulo*, the prosecution failed to disclose a mental evaluation which revealed that the defendant suffered from paranoid delusions. The evaluation was ordered after the defendant attacked another inmate and was performed during the defendant's trial on cocaine charges. The defense attorney discovered the mental health evaluation after the defendant had been convicted and sentenced on the cocaine charges.

The defense attorney then filed a motion for new trial, asserting that the prosecution violated standing discovery orders requiring the prosecution to produce the results of any physical or mental examinations. On appeal, the prosecution argued that although it suppressed the report, there was no prejudicial error requiring a new trial because the report would not have affected the outcome of the defendant's cocaine charges. The court disagreed, finding that suppression of the mental evaluation report was prejudicial error.

*Spagnuolo, supra*, is not applicable to this case. In *Spagnuolo*, the prosecution possessed a mental evaluation report which it failed to disclose to the defendant, despite a discovery order requiring them to disclose all such reports. In the present case, both the prosecution and Dunster were notified by the court's July 28, 1999, letter of the existence of DCS information relevant to sentencing. The trial court informed the parties of the confidential information at the hearing on August 6 and again at the sentencing hearing on November 22. The prosecution did not fail to disclose DCS information to Dunster. This assignment of error is without merit.

### 11. Consideration of All Mitigating Evidence

Dunster also contends that the contents of the confidential portion of the presentence report show that the trial court failed to properly "consider or discuss all of the mitigating information." Supplemental brief for appellant at 34.

Under § 29-2522, the sentencing determination of the court "shall be in writing and shall be supported by written

findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination." The court in its sentencing order must also " 'specify the factors it relied upon in reaching its decision' " and " 'focus on the individual circumstances of each homicide and each defendant.' " *State v. Simants*, 197 Neb. 549, 563-64, 250 N.W.2d 881, 889-90 (1977), *disapproved on other grounds, State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990). In the present case, the aggravating and mitigating circumstances and nonstatutory mitigating factors are set out with written findings of fact to support the court's determinations. We determine that the trial court's order satisfies § 29-2522.

Nevertheless, Dunster argues that the trial court's order is flawed because it does not adequately "consider or discuss" Dunster's bipolar disorder. Contrary to Dunster's assertions, the sentencing court did consider Dunster's bipolar disorder in considering mitigating circumstance (2)(c), noting specifically that in 1982, Dunster was prescribed Lithium, which "is used to treat manic-depressive (bipolar) disorder."

Mitigating circumstance (2)(c) exists when the "crime was committed while the offender was under the influence of extreme mental or emotional disturbance." § 25-2523. The disturbance must be "existing in the highest or the greatest possible degree, very great, intense, or most severe." *State v. Holtan*, 197 Neb. 544, 548, 250 N.W.2d 876, 880 (1977), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986). In determining that mitigating circumstance (2)(c) did not exist, the trial court stated:

It is clear Dunster has suffered since the beginning of his incarceration and continues to suffer from a mental and/or emotional condition; however, the evidence is that such condition was being treated by medication at the time Witt was killed. There is no evidence indicating Dunster's condition was at an "extreme" level at the time he killed Witt.

Under our de novo review, we conclude that the sentencing court correctly found that mitigating circumstance (2)(c) did not exist.

Dunster also contends that other facts contained in the confidential portion of the presentence report, for example, the fact

that "Dunster was not receiving the primary medication (Depakote) during the period leading up to the homicide," should have been specifically discussed in the sentencing court's order. Supplemental brief for appellant at 25. We first note that there is no evidence in the record which shows that Depakote was Dunster's "primary" medication. Instead, the record shows that for many years, Dunster has been treated with various combinations of medications. The record also shows that the trial court considered Dunster's medications during sentencing, noting in its order that at the time of Witt's murder, Dunster was taking Prozac and Doxepin.

Dunster's contention that the sentencing court failed to properly consider all of the mitigating evidence is without merit. As previously noted, our de novo review of the entire record, including the confidential portion of the presentence report, reveals no mitigating circumstances or factors except those which the sentencing court considered in its order. Furthermore, we have concluded that considering the entire record, the sentencing court correctly determined that the weight of the mitigating circumstance and any nonstatutory mitigating factors does not approach or exceed the weight of the aggravating circumstance. Accordingly, this assignment of error is without merit.

### 12. Obtaining Presentence Report

Dunster contends this court erred in "seeking additional material not requested by the State" when it requested the omitted portion of the presentence report. Supplemental brief for appellant at 30.

Dunster asserts that because the State failed to make a motion to supplement the record to include the confidential portion of the presentence report, it was improper for this court to obtain the omitted portion of the presentence report. Generally speaking, the party bringing the appeal has the responsibility to include within the bill of exceptions matters from the record which the party believes are material to the issues presented for review. See, Neb. Rev. Stat. § 25-1140 (Reissue 1995); *State v. Biernacki*, 237 Neb. 215, 465 N.W.2d 732 (1991); Neb. Ct. R. of Prac. 5B(1)a and b and (11) (rev. 2001). The appellee may then request to supplement the record and add additional evidence to the bill of exceptions. Neb. Ct. R. of Prac. 5B(1)c.

However, this appeal was not brought by either of the parties to this case. This appeal was automatically lodged with this court by operation of law pursuant to § 29-2525. An appeal pursuant to § 29-2525 does not place the burden of creating the record upon either party to the appeal. Instead, pursuant to § 29-2521.04, the district court must "provide all records required by the Supreme Court in order to conduct its review and analysis pursuant to sections 29-2521.01 to 29-2522 and 29-2524." Therefore, in a capital case, neither party to the appeal has the authority to restrict the record on appeal, either intentionally or through inadvertence. "All records" must be forwarded to the Clerk of the Supreme Court. This court has the authority and the obligation to require the district court to meet the statutory requirement that "all records" for any automatic appeal under § 29-2525 be filed with the Clerk of the Supreme Court.

Dunster, however, further argues that this court may not consider any portion of the presentence report because the report is not a part of the bill of exceptions. Dunster relies on *State v. Williams*, 253 Neb. 111, 123, 568 N.W.2d 246, 254 (1997), in which we stated that "evidence which is not made a part of the bill of exceptions may not be considered." In *Williams*, the petitioner brought a motion for postconviction relief and attached a supporting juror affidavit to the motion. We concluded that the affidavit could not be considered on appeal even though it was included in the transcript because the affidavit had never been offered, received, or considered by the court during the hearing.

Unlike the affidavit at issue in *Williams, supra*, presentence reports are not evidence offered by a party to a case. These reports are, pursuant to Neb. Rev. Stat. § 29-2261 (Reissue 1995), investigative tools ordered by the court for its use and consideration prior to sentencing. This court has never held that presentence reports must be offered and received into evidence and be made part of the bill of exceptions in order to be considered by the trial or appellate court in a criminal case. See *State v. Behrens*, 204 Neb. 785, 285 N.W.2d 513 (1979) (despite no bill of exceptions having been filed on appeal, Supreme Court examined presentence report on file to consider assigned error and affirm lower court's sentence). While a presentence report may be included as an exhibit in the bill of exceptions, it need not be

in order to be considered on appeal. *Williams* is inapposite to the facts of this case and does not support Dunster's assertion that this court is precluded from reviewing the entire presentence report which was ordered, submitted to, and considered by the sentencing court below.

When Dunster's presentence report was filed with the Clerk of the Supreme Court, the confidential portion of the report was omitted. In requesting the probation office to supply the omitted portion of the report, this court simply rectified an oversight in order to review "all records" required under "29-2521.01 to 29-2522 and 29-2524." See § 29-2521.04.

Finally, Dunster further contends that this court's actions violated *Jim's, Inc. v. Willman*, 247 Neb. 430, 527 N.W.2d 626 (1995). In *Willman*, the appellant asserted that the trial court erred in failing to recuse itself after the court encouraged one of the parties to file a motion for summary judgment and indicated in advance how the court would rule on such a motion. We concluded that the trial judge in *Willman* should have recused himself. However, in the present case, this court's request for the omitted portion of the presentence report was not an indication as to how this court might rule on a particular issue. This court simply fulfilled its responsibilities in conformity with the requirements of §§ 29-2521.01 through 29-2525. Accordingly, *Willman* has no application here.

This court's request for the omitted portion of the presentence report honors the intent of the Legislature to provide "the most scrupulous standards of fairness and uniformity" in imposing a sentence of death. See § 29-2521.01(1). As the Supreme Court noted in *Gardner v. Florida*, 430 U.S. 349, 361, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), "the submission of a less complete record to the reviewing court than the record on which the trial judge based his decision to sentence petitioner to death" is not justifiable in a capital case. This final assignment of error is also without merit.

## VI. CONCLUSION

Dunster's convictions and sentences are affirmed.

AFFIRMED.